JOHN R. SPARKS, III, AND CAROLYN SPARKS, HIS WIFE, PLAINTIFFS-RESPONDENTS, v. ST. PAUL INSURANCE CO., A CORPORATION DOING BUSINESS IN NEW JERSEY, DEFENDANT-APPELLANT.

Argued March 5, 1985—Decided July 25, 1985.

*Leonard Rosenstein* argued the cause for appellant (*Feuerstein, Sachs, Maitlin, Rosenstein & Fleming,* attorneys).

*Herbert C. Kaplan* argued the cause for respondent (*Kaplan, Feingold and Kaplan,* attorneys).

*Henry G. Morgan* submitted a brief on behalf of *amici curiae,* American Insurance Association and the Alliance of American Insurers (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys).

The opinion of the Court was delivered by

STEIN, J.

In this case, as in *Zuckerman v. National Union Fire Ins. Co.*, 100 *N.J.* 304 (1985), which the Court also decides today, we consider the enforceability of certain coverage limitations contained in a "claims made" professional liability insurance policy issued by appellant St. Paul Insurance Company (St. Paul). The trial court and the Appellate Division refused to enforce the policy provision limiting coverage to claims and potential claims reported to St. Paul during the policy period. We granted the insurance company's petition for certification, 99 *N.J.* 211 (1984), in order to resolve the apparent conflict between the unreported Appellate Division decision in this case and the Appellate Division decision in *Zuckerman, supra,* 194 *N.J.Super.* 206 (1984), enforcing a similar provision in the "claims made" policy at issue in that case.

I

The material facts are not in dispute. In November, 1978, respondents, John and Carolyn Sparks, retained A. Raymond Guarriello, a New Jersey attorney, to represent them in connection with the sale of their residence. That transaction resulted in litigation between respondents and the prospective purchasers. In the course of that litigation, apparently due to Guarriello's negligence, Mr. and Mrs. Sparks failed to answer interrogatories. This resulted in an order entered in mid-October, 1979, suppressing the Sparks' answer and counterclaim. A default judgment for specific performance was entered against Mr. and Mrs. Sparks in February, 1980, and a money judgment for $18,899.08 was entered against them in May, 1981. It is not disputed that Guarriello's negligence was the proximate cause of the judgments against Mr. and Mrs. Sparks.

On November 6, 1976, appellant, St. Paul, issued Guarriello a one-year professional malpractice policy that was renewed for successive one-year periods, terminating on November 6, 1979. On September 27, 1979, St. Paul issued a substitute policy for

one additional year that was to take effect on November 6, 1979. Guarriello failed to pay the premium and appellant sent Guarriello a notice cancelling the substitute policy, effective January 21, 1980. Between June and August of 1980, substituted counsel for respondents notified St. Paul of the underlying facts and demanded that the insurance company provide malpractice coverage with respect to Guarriello's negligence.

The policy issued to Guarriello in 1976 was denominated a "claims made" policy. A "Schedule" attached to the declaration page of the policy bore the following notice:

### TO OUR POLICYHOLDERS

This is a "claims made" Coverage Form. It only covers claims arising from the performance of professional services *subsequent to the retroactive date indicated* and then only to claims first made within the provisions of the Policy while this Coverage Form is in force. No coverage is afforded for claims first made after the termination of this insurance unless and to the extent that Reporting Endorsements are purchased in accordance with Condition 3 of this Coverage Form. Please review the Policy carefully. [Emphasis added.]

The retroactive date set forth in the policy was November 6, 1976, the same date as the effective date of coverage. Therefore, unlike the standard "claims made" policy that was involved in our decision in *Zuckerman, supra,* 100 *N.J.* at 307–309, St. Paul's policy provided no retroactive coverage whatsoever during its first year. In that year, the coverage provided by the policy applied only to errors and omissions that occurred during the policy year and were reported to the company within the policy year. During the two renewal years beginning November 6, 1977 and November 6, 1978, the policy afforded "retroactive" coverage for negligence that occurred subsequent to November 6, 1976.

In April, 1981, St. Paul rejected respondent's demand that it provide coverage for Guarriello's malpractice since the company received notice of the claim after the termination of the second renewal policy in November, 1979 and after the January, 1980 cancellation of the replacement policy for nonpayment of the

premium.[1] In June, 1981, Mr. and Mrs. Sparks obtained a $42,968.08 judgment against Guarriello based upon his malpractice.

The present action commenced in October, 1981. Mr. and Mrs. Sparks sought a declaratory judgment that the liability insurance policy issued by St. Paul was valid and enforceable to pay the judgment obtained against Guarriello. In August, 1983, St. Paul's motion for summary judgment was denied and in September, 1983, summary judgment was granted in favor of Mr. and Mrs. Sparks. That judgment was affirmed by the Appellate Division, which held "claims made" policies to be unenforceable as violative of public policy.

## II

In our decision in *Zuckerman, supra,* 100 *N.J.* at 309–313, we summarized the origins of "claims made" or "discovery" liability policies and emphasized the distinction between such policies and the more traditional "occurrence" policies. That distinction warrants reiteration in view of the unusual provisions of the policy issued to Guarriello by St. Paul:

[T]here are two types of Errors and Omissions Policies: the "discovery" policy and the "occurrence" policy. In a discovery policy the coverage is effective if the negligent or omitted act is discovered and brought to the attention of the insurance company during the period of the policy, no matter when the act occurred. In an occurrence policy the coverage is effective if the negligent or omitted act occurred during the period of the policy, whatever the date of discovery. [*Samuel N. Zarpas, Inc. v. Morrow,* 215 *F.Supp.* 887, 888 (D.N.J. 1963).]

Another court characterized "claims made" policies as "provid[ing] unlimited retroactive coverage and no prospective coverage at all," as distinguished from "occurrence" policies which

---

[1] Although St. Paul's Notice of Cancellation stated that it would be effective January 21, 1980, the insurance company now maintains that its effect was to cancel the replacement policy *ab initio* as of November 6, 1979. As discussed *infra* at 340–341 & n. 5, the effective date of the cancellation is not material.

"provide unlimited prospective coverage and no retroactive coverage at all." *Brander v. Nabors*, 443 *F.Supp.* 764, 767 (N.D.Miss.), aff'd, 579 *F.*2d 888 (5th Cir.1978).

The distinction between the two types of policies has also been described in terms of the peril insured:

> In the "occurrence" policy, the peril insured is the "occurrence" itself. Once the "occurrence" takes place, coverage attaches even though the claim may not be made for some time thereafter. While in the "claims made" policy, it is the making of the claim which is the event and peril being insured and, subject to policy language, regardless of when the occurrence took place. [S. Kroll, "The Professional Liability Policy 'Claims Made,'" 13 *Forum* 842, 843 (1978).]

In *Zuckerman, supra,* 100 *N.J.* at 311–313, we discussed in detail the significant social utility of the "claims made" policy that has led to its supplanting the occurrence policy in the professional liability field. We noted that since the insurance company that issues an "occurrence" policy is exposed to a "tail"—that is, the lapse of time between the occurrence and the date on which the claim is made—there is considerable difficulty in accurately calculating underwriting risks and premiums with respect to perils that typically lead to long tail exposure. Moreover, claims asserted in the fields of professional malpractice, products liability, and environmental law often present the added difficulty of determining precisely when the actuating event "occurred" for the purpose of defining coverage. From the standpoint of the insured, there is the danger of inadequate coverage in cases in which claims are asserted long after the error or omission occurred, because inflationary factors lead to judgments that are higher than those originally contemplated when coverage was purchased years earlier. *Id.,* 100 *N.J.* at 311–313.

From the insurer's perspective, the clear advantage derived from a "claims made" policy is the limitation of liability to claims asserted during the policy period. This limitation enables insurers to calculate risks and premiums with greater precision. Although "claims made" policies provide coverage for errors and omissions occurring prior to the policy's inception, the elimination of exposure to claims filed after the policy

expiration date enables companies to issue these policies at reduced premiums. *Zuckerman, supra,* 100 *N.J.* at 312–313; J. Parker, "The Untimely Demise of the 'Claims Made' Insurance Form? A Critique of *Stine v. Continental Casualty Co.*," 1983 *Det.C.L.Rev.* 25, 73.

In *Zuckerman,* we observed that courts throughout the country have upheld the validity of "claims made" policies. 100 *N.J.* at 313–314. Although "claims made" policies have regularly been challenged on public policy grounds, the vast majority of courts that have considered these challenges have enforced the policies as written. *See, e.g., Brander v. Nabors, supra,* 443 *F.Supp.* 764; *Gulf Ins. Co. v. Dolan, Fertig & Curtis,* 433 *So.*2d 512 (Fla.1983); *Livingston Parish School Bd. v. Fireman's Fund Am. Ins. Co.,* 282 *So.*2d 478 (La. 1973); *Stine v. Continental Cas. Co.,* 419 *Mich.* 89, 349 *N.W.*2d 127 (1984).[2]

The courts that have declined to enforce "claims made" policies have based their decisions on special factual circumstances. *J.G. Link & Co. v. Continental Cas. Co.,* 470 *F.*2d 1133 (9th Cir.1972), *cert.* denied, 414 *U.S.* 829, 94 *S.Ct.* 55, 38 *L.Ed.*2d 63 (1973) (policy covered claims made during policy period but due to certain ambiguities in policy language, court could not determine if policy was intended to provide "occurrence" or "claims made" coverage); *Gyler v. Mission Ins. Co.,* 10 *Cal.*3d 216, 514 *P.*2d 1219, 110 *Cal.Rptr.* 139, (1973) (policy insuring against "claims which *may* be made" during the policy period found to be too ambiguous to allow enforcement of "claims made" coverage limitation) (emphasis added); *see Zuckerman, supra,* 100 *N.J.* at 317.

We also reviewed in *Zuckerman, supra,* the commercial utility of "claims made" policies and scrutinized the terms of the policy at issue in that case. 100 *N.J.* at 311–313, 319.

---

[2]For a more complete list of cases enforcing "claims made" policies, see *Zuckerman, supra,* 100 *N.J.* 313–314.

We concluded that there were "no considerations of public policy that would inhibit \* \* \* enforcement of the 'claims made' policy issued to appellant [Zuckerman]." *Id.* at 321. Similarly, we would not hesitate to enforce St. Paul's policy in this case if it comported with the generally accepted expectations of "claims made" insurance. The coverage provided by St. Paul's policy, however, materially diverges from customary "claims made" coverage in terms of its retroactive protection. It provides neither the prospective coverage typical of an "occurrence" policy, nor the retroactive coverage typical of a "claims made" policy. During the first policy year, coverage was limited to acts of malpractice that occurred, were discovered, and were reported to the insurance company during the same year. Although there was slight retroactive coverage during the second and third renewal years of the policy, the retroactive coverage was significantly more limited than that contemplated in the standard "claims made" policy. *See* S. Kroll, *supra,* 13 *Forum* at 843, 850, 854 (1978); D. Shand, " 'Claims Made' vs 'Occurrence,' " 27 *Int'l Ins. Monitor* 269, 270, 273 (1974); D. Shand, "Is Your Policy on a 'Claims Made' Basis?," *The Weekly Underwriter,* Sept. 15, 1973, at 8; J. Parker, *supra,* 1983 *Det.C.L.Rev.* 25, 27 & n. 3.

### III

*Jones v. Continental Cas. Co.,* 123 *N.J.Super.* 353 (Ch.Div. 1973), is the only reported case in which a "claims made" policy was invalidated because of its lack of retroactive coverage. Jones was a professional engineer who was insured against errors and omissions under a policy that took effect in February, 1965, and was renewed annually until its termination in April, 1970. In August, 1971, a contractor sued Jones for malpractice based upon engineering services he had performed during the policy period. Jones' insurance carrier declined coverage because it did not receive notification of the claim during the policy period. Jones, seeking to compel coverage, sued the carrier. *Id.* at 354–56

The retroactive coverage provided for in Jones' policy was unusual in that it was limited "to errors, omissions or negligent acts which occur[red] * * * prior to the effective date of this policy *if* * * * *insured by this Company under [a] prior policy." Id.* at 356 (emphasis added). The court concluded that this retroactive coverage impermissibly inhibited plaintiff's freedom of contract because he would be deprived of coverage if he did not continue to renew his policy with the same insurance company. *Id.* at 359. The court also held that the total absence of prospective coverage violated this State's public policy in favor of extending time for making a claim or bringing suit for latent injuries. *Id.* at 361–63. Accordingly, the court declined to enforce the coverage limitations in defendant's policy, concluding, on public policy grounds, that such limitations were inconsistent with the plaintiff's "reasonable expectations" of coverage and that plaintiff's notice to defendant was sufficiently timely to invoke coverage under the policy. *Id.* at 359–63.

Other state and federal courts confronted with "claims made" policies providing limited or no retroactive coverage have declined to follow *Jones. Brander v. Nabors, supra,* 443 *F.Supp.* 764 (applying Mississippi law); *Livingston Parish School Bd. v. Fireman's Fund Am. Ins. Co.,* 282 *So.*2d 478 (La.1973); *Stine v. Continental Cas. Co.,* 419 *Mich.* 89, 349 *N.W.*2d 127 (1984); *Gereboff v. Home Indemnity Co.,* 119 *R.I.* 814, 383 *A.*2d 1024 (1978).[3] But at least one proponent of

---

[3]The cases rejecting *Jones* reasoned that because unambiguous provisions of the policies clearly restricted retroactive coverage, and premiums were presumably reduced to reflect the limited protection, there was no basis on which to invalidate the limitations on coverage. Other cases have enforced "claims made" policies that afforded significantly limited or no retroactive coverage without expressly discussing that issue. *See, e.g., Scarborough v. Travelers Ins. Co.,* 718 *F.*2d 702 (5th Cir.1983); *James & Hackworth v. Continental Cas. Co.,* 522 *F.Supp.* 785 (N.D.Ala.1980); *Mission Ins. Co. v. Nethers,* 119 *Ariz.* 405, 581 *P.*2d 250 (Ct.App.1978); *Gulf Ins. Co. v. Dolan, Fertig & Curtis,* 433 *So.*2d 512 (Fla.1983); *Graman v. Continental Cas. Co.,* 87 *Ill.App.*3d 896, 42 *Ill.Dec.* 772,

"claims made" policies has acknowledged the unique limitations of the coverage afforded by the "claims made" policy in *Jones:*

> Indeed, the *Jones* [*sic* ] policy was peculiarly narrow in its coverage; it required the insured to have been covered by prior policies issued *only* by the insurer as a condition precedent to being covered for errors and omissions accruing prior to the effective date of the policy. " " " Consequently, because the insured did not have prior policies with CNA, the *Jones* policy afforded the insured coverage only for acts occurring during the term of insurance and then only if the policy was maintained; in effect, it only provided "occurrence" coverage without the prospective benefits of the same. [J. Parker, *supra,* 1983 *Det.C.L.Rev.* at 36 n. 38.]

Similarly, in *Brander v. Nabors, supra,* 443 *F.Supp.* 764, a federal district court in Mississippi considered a "claims made" policy that provided no retroactive coverage but afforded prospective coverage for a three-year period beyond the policy expiration date. Although, in the context of that policy, the court found no necessity for retroactive protection, it conceded that a more significant problem would be presented by a policy affording neither prospective nor retroactive coverage:

> We would be confronted with a more serious question of public policy if a "claims made" policy with neither a period of retroactive coverage nor a period of prospective coverage, but requiring notice to the insured within the policy period, were involved; in that event, the insurance coverage would be effective only for the time premiums are paid, and during which notice of the claim would have to be given to the insurer. Such a policy would necessitate closer scrutiny from the standpoint of what period of coverage is reasonable in light of public policy. That precise issue is, however, not before us, and we express no opinion as to the validity of a policy structured on such narrow grounds. [*Id.,* 443 *F.Supp.* at 773.]

## IV

■ Although it is a well-established principle that insurance contracts will not be enforced if they violate public policy, *Rotwein v. General Accident Group,* 103 *N.J.Super.* 406, 416 (Law Div.1968); *Jorgenson v. Metropolitan Life Ins. Co.,* 136 *N.J.L.* 148, 152–54 (Sup.Ct.1947); *see Allen v. Commercial Cas. Ins. Co.,* 131 *N.J.L.* 475 (E. & A.1944); 6B *Appleman, Insur-*

---

409 *N.E.*2d 387 (App.Ct.1980); *Troy & Stalder Co. v. Continental Cas. Co.,* 206 *Neb.* 28, 290 *N.W.*2d 809 (1980).

*ance Law and Practice* § 4254, at 28 & n. 28 (1979), the application of that principle has been limited in order that freedom of contract is not impaired unreasonably:

> "[P]ublic policy" is that principle of law which holds that "no person can lawfully do that which has a tendency to be injurious to the public or against public good * " * " even though "no actual injury" may have resulted therefrom in a particular case "to the public." It is a question of law which the court must decide in light of the particular circumstances of each case.
>
> \* \* \* \* \* \* \* \*
>
> Men of "full age and competent understanding" have the "utmost liberty of contracting." Contracts so freely and voluntarily made, in the absence of express or implied prohibition, are sacred and are enforced by courts of justice. And courts do "not lightly interfere with this freedom of contract." Lord Jessel, in *Printing Registering Co. v. Sampson*, 19 *Eq.* 462, 465; 21 *E.R. Co.* 696, 699 (cited in *Driver v. Smith, supra* [89 *N.J.Eq.*] at *p.* 359). Or in the words of the late Mr. Justice Butler, "The principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reasons on which the doctrine rests." *Twin City Pipe Line Co. v. Harding Glass Co., supra*, 283 *U.S.* 353 (at *p.* 356 [51 *S.Ct.* 476, at *p.* 477, 75 *L.Ed.* 1112 (1931)]); 75 *L.Ed.* 1116. [*Allen v. Commercial Cas. Ins. Co., supra*, 131 *N.J.L.* at 477–78.]

The doctrine that courts do not lightly interfere with freedom of contract must be applied cautiously and realistically with regard to complex contracts of insurance, since such contracts are highly technical, extremely difficult to understand, and not subject to bargaining over the terms. They are contracts of adhesion, prepared unilaterally by the insurer, and have always been subjected to careful judicial scrutiny to avoid injury to the public. *DiOrio v. New Jersey Mfrs. Ins. Co.*, 79 *N.J.* 257, 269 (1979); *Allen v. Metropolitan Life Ins. Co.*, 44 *N.J.* 294, 305–06 (1965).

For example, in *Gaunt v. John Hancock Mut. Life Ins. Co.*, 160 *F.*2d 599 (2d Cir.), *cert.* denied, 331 *U.S.* 849, 67 *S.Ct.* 1736, 91 *L.Ed.* 1858 (1947), Judge Learned Hand rejected an insurance company's contention that the language set forth on a receipt for a life insurance premium postponed commencement of coverage until the insurer approved the application:

> An underwriter might so understand the phrase, when read in its context, but the application was not to be submitted to underwriters; it was to go to persons

> utterly unacquainted with the niceties of life insurance, who would read it colloquially. It is the understanding of such persons that counts; and not one in a hundred would suppose that he would be covered, not "as of the date of completion of Part B," as the defendant promised, but only as of the date of approval. [*Id.* at 601 (footnote omitted).]

 The recognition that insurance policies are not readily understood has impelled courts to resolve ambiguities in such contracts against the insurance companies. *See Di Orio v. New Jersey Mfrs. Ins. Co., supra,* 79 *N.J.* at 269; *Remsden v. Dependable Ins. Co.,* 71 *N.J.* 587, 589 (1976); *Bryan Constr. Co. v. Employers' Surplus Lines Ins. Co.,* 60 *N.J.* 375, 377–78 (1972); *Allen v. Metropolitan Life Ins. Co., supra,* 44 *N.J.* at 305–06.

 This recognition has also led courts to enforce unambiguous insurance contracts in accordance with the reasonable expectations of the insured. For example, in *Gerhardt v. Continental Ins. Cos.,* 48 *N.J.* 291 (1966), the insured claimed that her comprehensive homeowner's policy covered a workmen's compensation claim by a residential employee injured while working at the insured's home. The Court reviewed policy language and found it to be highly technical and difficult to understand. *Id.* at 298–300. As to the policy's express exclusion of workmen's compensation coverage, the Court noted:

> This quoted language was obscure on first reading to both counsel and the Court * * *.
>
> After the purpose of the quoted language is * * * explained it is understandable, but it seems highly unlikely that the ordinary insured would have so understood it on his or her own reading. As far as the plaintiff here was concerned, nowhere was there any straightforward and unconditional statement that the policy was not intended to protect the insured against a workmen's compensation claim by a residence employee injured at the insured's home. [*Id.* at 299 (citation omitted).]

Accordingly, the Court determined that the language in issue, while perhaps not ambiguous, was nevertheless insufficiently clear to justify depriving the insured of her reasonable expectation that coverage would be provided. In determining that the policy would be construed so as to provide workers' compensa-

tion coverage, the Court quoted with approval from *Allen v. Metropolitan Life Ins. Co., supra,* 44 *N.J.* at 305:

"While insurance policies and binders are contractual in nature, they are not ordinary contracts but are 'contracts of adhesion' between parties not equally situated. See *Steven v. Fidelity and Casualty Co. of New York,* 58 *Cal.*2d 862, 27 *Cal.Rptr.* 172, 377 *P.*2d 284, 296–298 (1962); *cf. Linden Motor Freight Co., Inc. v. Travelers Ins. Co.,* 40 *N.J.* 511, 524–525 (1963); *Henningsen v. Bloomfield Motors, Inc.,* 32 *N.J.* 358, 389 (1960). The company is expert in its field and its varied and complex instruments are prepared by it unilaterally whereas the assured or prospective assured is a layman unversed in insurance provisions and practices. He justifiably places heavy reliance on the knowledge and good faith of the company and its representatives and they, in turn, are under correspondingly heavy responsibility to him. His reasonable expectations in the transaction may not justly be frustrated and courts have properly molded their governing interpretative principles with that uppermost in mind." 44 *N.J.* at *p.* 305. [*Gerhardt v. Continental Ins. Cos., supra,* 48 *N.J.* at 297.]

Similarly, *Kievit v. Loyal Protective Life Ins. Co.,* 34 *N.J.* 475 (1961), concerned the scope of coverage afforded under a disability insurance policy. Plaintiff, a carpenter, was injured when struck in the face by a "two by four" board and he sought disability benefits under the policy. The company contended that the policy did not provide coverage because a preexisting condition, Parkinson's disease, had contributed to plaintiff's injuries and an exclusion in the policy barred coverage with respect to such conditions. Although the Court found that the policy, read literally, contained such an exclusion, it declined to limit the coverage because this would frustrate the insured's reasonable expectations:

When members of the public purchase policies of insurance they are entitled to the broad measure of protection necessary to fulfill their reasonable expectations. They should not be subjected to technical encumbrances or to hidden pitfalls and their policies should be construed liberally in their favor to the end that coverage is afforded "to the full extent that any fair interpretation will allow." Francis, J., in *Danek v. Hommer,* 28 *N.J.Super.* 68, 76 (App.Div.1953), affirmed 15 *N.J.* 573 (1954). Where particular provisions, if read literally, would largely nullify the insurance, they will be severely restricted so as to enable fair fulfillment of the stated policy objective. See [2] *Richards,* [*Insurance* ] *supra, p.* 742 [ (5th ed. 1952) ], where the author notes that the common clause to the effect that the death or disability must result from accident "independently of all other causes" would, if taken literally, be so unreasonable and repugnant to the main purpose of the policy "that the courts construe it

very strictly against the insurers, and sometimes really seem to disregard it altogether."

\* \* \* \* \* \* \* \*

\* \* \* [T]he court's goal in construing an accident insurance policy is to effectuate the reasonable expectations of the average member of the public who buys it; he may hardly be expected to draw any subtle or legalistic distinctions based on the presence or absence of the exclusionary clause for he pays premiums in the strong belief that if he sustains accidental injury which results (in the commonly accepted sense) in his disability he will be indemnified and not left empty-handed on the company's assertion that his disability was caused or contributed to by a latent disease or condition of which he was unaware and which did not affect him before the accident. [*Id.* at 482–84, 488–89.]

The interpretation of insurance contracts to accord with the reasonable expectations of the insured, regardless of the existence of any ambiguity in the policy, constitutes judicial recognition of the unique nature of contracts of insurance. By traditional standards of contract law, the consent of both parties, based on an informed understanding of the terms and conditions of the contract, is rarely present in insurance contracts. W.D. Slawson, "Standard Form Contracts and Democratic Control of Lawmaking Power," 84 *Harv.L.Rev.* 529, 539–41 (1971); *R. Keeton, Insurance Law* 350–52 (1971). Because understanding is lacking, the consent necessary to sustain traditional contracts cannot be presumed to exist in most contracts of insurance. Such consent can be inferred only to the extent that the policy language conforms to public expectations and commercially reasonable standards. *See* W.D. Slawson, *supra,* 84 *Harv.L.Rev.* at 566; *R. Keeton, supra,* at 350–52. In instances in which the insurance contract is inconsistent with public expectations and commercially accepted standards, judicial regulation of insurance contracts is essential in order to prevent overreaching and injustice. *R. Keeton, supra,* at 350–52; R. Keeton, "Insurance Law Rights at Variance with Policy Provisions," 83 *Harv.L.Rev.* 961, 967 (1970). One commentator has stated the principle as follows:

The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though

painstaking study of the policy provisions would have negated those expectations. [*R. Keeton, supra,* at 351; R. Keeton, *supra,* 83 *Harv.L.Rev.* at 967.]

We find that the contract of insurance sold by St. Paul to Guarriello does not conform to the objectively reasonable expectations of the insured and is violative of the public policy of this State. Although we held today in *Zuckerman v. National Union Fire Ins. Co., supra,* 100 *N.J.* 304 (1985), that a "claims made" policy that fulfills the reasonable expectations of the insured with respect to the scope of coverage is valid and enforceable, the policy at issue here is substantially different from the standard "claims made" policy. Indeed, St. Paul's policy combines the worst features of "occurrence" and "claims made" policies and the best of neither. It provides neither the prospective coverage typical of an "occurrence" policy, nor the "retroactive" coverage typical of a "claims made" policy. During the first year that the policy was in force, it provided no retroactive coverage for occurrences prior to the effective date of the policy. Thus, it afforded the insured only minimal protection against professional liability claims. Only claims asserted during the policy year, based on negligence that occurred during the policy year, and that were subsequently communicated to the company during the policy year were under the umbrella of coverage.

The realities of professional malpractice, however, suggest that it would be the rare instance in which an error occurred and was discovered with sufficient time to report it to the insurance company, all within a twelve-month period. The victims of professional malpractice are frequently unaware of any negligence until their injury becomes manifest long after the error or omission was committed.

Our review of the use of "claims made" policies in the professional liability field demonstrates that a policy that defines the scope of coverage so narrowly is incompatible with the objectively reasonable expectations of purchasers of professional liability coverage. We assume that there are vast numbers of professionals covered by "claims made" policies who are

unaware of the basic distinction between their policies and the traditional "occurrence" policy. *See Middle Dep't Inspection Agency v. Home Ins. Co.,* 154 *N.J.Super.* 49, 55–56 (App.Div. 1977), certif. denied, 76 *N.J.* 234 (1978). However, those professionals covered by "claims made" policies who do understand how their policies differ from "occurrence" policies would expect that in return for the loss of prospective coverage provided by "occurrence" policies, they would be afforded reasonable retroactive coverage by their "claims made" policies. A leading proponent of "claims made" coverage has characterized this *quid pro quo*—the relinquishment of prospective coverage in return for retroactive coverage—as *"the essential* trade-off inherent in the concept of 'claims-made' insurance." S. Kroll, *supra,* 13 *Forum* at 854 (emphasis added); *see* J. Parker, *supra,* 1983 *Det.C.L.Rev.* at 27 & n. 3.

We do not decide in this case the precise standard by which the reasonableness of retroactive coverage is to be measured. We hold, however, that where there has been no proof of factual circumstances that would render such limited retroactive coverage both reasonable and expected,[4] a "claims made" policy that affords no retroactive coverage whatsoever during its initial year of issuance does not accord with the objectively reasonable expectations of the purchasers of professional liability insurance. The fact that subsequent renewals of that policy provide minimal retroactive coverage, *i.e.,* to the effective date of the original policy, does not cure the significant deficiency inherent in the underlying policy.

To enforce policies that provide such unrealistically narrow coverage to professionals, and, derivatively, to the public they serve, would in our view cause the kind of broad injury to the

---

[4]"Claims made" policies with no retroactive coverage might be appropriate in certain contexts. For example, such policies might properly be offered at a reduced premium to the professional in his very first year of practice, or to the professional who changes from "occurrence" to "claims made" protection. Nothing in the record before us suggests that this is such a case.

public at large contemplated by the doctrine that precludes the enforcement of contracts that violate public policy. *See Allen v. Commercial Cas. Ins. Co., supra,* 131 *N.J.L.* at 477–78. Put another way, were we to uphold the validity of St. Paul's policy in this case, the likely result would be the perpetuation in the professional liability insurance market of "claims made" policies offering comparably limited coverage. Because insurance contracts are contracts of adhesion, the terms of which are not customarily bargained for, courts have a special responsibility to prevent the marketing of policies that provide unrealistic and inadequate coverage.

Because in our view the policy sold by respondent is not a true "claims made" policy, we hold that the provisions in the policy that limit coverage to claims asserted only during the policy period are unenforceable. In view of its peculiar, absolute limitations on retroactive coverage, we construe the policy, despite its denomination, as one analogous to an "occurrence" policy. We therefore impute into the policy's provisions a right of prospective notification in order that the policy, as construed by us, provide a scope of coverage commensurate with the reasonable expectations of the insured as to "occurrence" policy coverage. Thus construed, we hold that the actual notice afforded to St. Paul by the attorneys for respondents between June and August, 1980 was furnished as soon as possible under the circumstances.[5] We follow in this limited and special factu-

---

[5]New attorneys for Mr. and Mrs. Sparks were substituted in place of Guarriello on April 8, 1980. They provided St. Paul with official notice of the claim against Guarriello between June and August, 1980. Under the circumstances, we cannot say that the timing of such notice was unreasonable.

We are cognizant that had St. Paul's policy contained adequate retroactive coverage, Mr. and Mrs. Sparks would not have been afforded coverage. *See Zuckerman, supra,* 100 *N.J.* 304. An alternative construction of the policy would impute into it reasonable retroactive coverage and sustain the enforceability of the notice requirement. We reject this approach. It would be inequitable to hold an insurance policy void as against public policy and yet, when deciding between two plausible constructions of that policy, adopt the construction that is favorable to the drafter of the offensive document.

al setting the doctrine of *Cooper v. Government Employees Ins. Co.*, 51 *N.J.* 86 (1968), and find that there is no necessity to consider whether the insurance company is exposed to prejudice if the notice has been provided within a reasonable time. We emphasize, as we noted in *Zuckerman, supra,* 100 *N.J.* at 323–324, the total inapplicability of the *Cooper* doctrine to a true "claims made" policy, but we apply its principle here because of our conclusion that this policy should be construed as a traditional "occurrence" form rather than as a "claims made" policy.

Accordingly, we hold that under these circumstances, the claim asserted by respondents against Guarriello, to the extent that it is based upon negligence that occurred during the policy period, is within the coverage afforded by appellant's policy. The notice to appellant between June and August, 1980, is sufficient to invoke that coverage. Accordingly, we modify and affirm the judgment of the Appellate Division and remand the matter to the trial court to consider, in accordance with the principles set forth in this opinion, any unresolved issues with respect to the specific coverage afforded by St. Paul's policy for the money judgment recovered against Guarriello.[6] We do not retain jurisdiction.

---

[6]This Court has not ruled previously that "claims made" policies without adequate retroactive coverage are contrary to the public policy of this State. In note 4, *supra,* we referred to the narrow circumstances in which such policies might be appropriate and valid. Accordingly, on remand the trial court should not be precluded from considering evidence tending to prove that the terms of this policy were specifically understood and bargained for by Guarriello and that, although a policy with adequate retroactive coverage was available to him from St. Paul, he specifically elected to purchase this policy with no retroactive coverage in the first year. Our holding is based on the record before us and on the assumption that, had any such evidence existed, it would have been offered in opposition to the motion for summary judgment.

If such evidence is offered, and the trial court concludes that the evidence is sufficient to prove that although insurance contracts are normally contracts of adhesion, good faith bargaining in this instance took place between the parties; that the terms of this policy were specifically bargained for and understood by Guariello; and that the policy was purchased by him in preference to a policy

*For modification and affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.

with adequate retroactive coverage, the trial court would then be justified in enforcing the policy as written.