719 A.2d 645 (1998)
315 N.J. Super. 586
BOARD OF EDUCATION OF THE TOWNSHIP OF UNION, Union County, Plaintiff-Respondent,
v.
NEW JERSEY SCHOOL BOARDS ASSOCIATION INSURANCE GROUP, Defendant-Appellant, and
Selective Insurance Company of America, Defendant-Respondent.
BOARD OF EDUCATION OF THE TOWNSHIP OF UNION, Union County, Plaintiff-Appellant,
v.
NEW JERSEY SCHOOL BOARDS ASSOCIATION INSURANCE GROUP and Selective Insurance Company of America, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued September 24, 1998.
Decided October 22, 1998.
*646 Scott R. Knapp, Haddonfield, for defendant-appellant in A-2359-97T5 and defendant-respondent in A-2444-97T5 New Jersey School Boards Association Insurance Group (Archer & Greiner, attorneys; Mr. Knapp, on the brief).
Howard Schwartz, Union, for plaintiff-appellant in A-2444-97T5 and plaintiff-respondent in A-2359-97T5 Board of Education of the Township of Union (Schwartz Barkin & Mitchell, attorneys; Mr. Schwartz, on the brief).
Glenn R. Moran, Cedar Knolls, for defendant-respondent Selective Insurance Company of America (Leary, Bride, Tinker & Moran, attorneys; Mr. Moran, of counsel and on the brief; David J. Dering, Elizabeth, on the brief).
Before Judges PRESSLER, KLEINER and STEINBERG.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This is an insurance coverage case. In March 1994, R.C., an adult handicapped student, instituted an action in the Federal District Court against the Board of Education of the Township of Union (Board) and a group of its employees, asserting, in multiple counts, that they had deprived him of his federal constitutional and statutory rights by failing properly to respond to his special education needs as a multi-handicapped student. R.C. sought both compensatory and punitive damages against them. The Board, plaintiff in this action, sought a defense and indemnity from its insurers, defendants New Jersey School Boards Association Insurance Group (Group) and Selective Insurance Company of America (Selective), under their respective commercial general liability (CGL) coverages and their errors and omissions coverages. Both disclaimed, and plaintiff brought this declaratory judgment action. On motions and cross-motions for summary judgment, the trial court dismissed the action in its entirety against Selective. The court also concluded that while Group was liable to defend and indemnify under its errors and omissions coverage, it had no such obligation under its CGL policy. The Board appeals from that portion of the judgment dismissing as to Selective on both its coverages and dismissing as to the Group's CGL coverage. Group appeals from that portion of the judgment requiring it to defend and indemnify under its errors and omissions coverage.
We have consolidated the two appeals and now affirm in part and reverse in part. We agree with the trial judge that neither defendant has an obligation under its respective CGL coverage. As to the two errors and omissions coverages, both of which are of the claims-made type, the legal issue is when, according to the respective policy language, the claim for which coverage was sought by the Board, namely, R.C.'s federal action, was made against it. Because of the disparate coverage language in the two policies, we conclude that the triggering claim under the Group policy was made in December 1992 and that the triggering claim under the Selective policy was made in March 1994. Accordingly, we are persuaded that both carriers have the obligation to defend and indemnify against R.C.'s federal action under their respective errors and omissions coverage.
We address the coverage issues in the light of R.C.'s claims against the Board, as to which the record is sparse but apparently undisputed. Insofar as we are able to determine, R.C., then a high school student at Union High School, suffered permanent and severe traumatic brain injury in an automobile accident in 1988. The gravamen of his federal complaint is that during the period of his convalescence, the Board failed to provide him with educational services, and that thereafter, the Board erroneously classified him as emotionally disturbed rather than as multiply handicapped and then persistently and continuously failed to provide him with the educational services and residential placement mandated by the Individuals with Disabilities Education Act, 20 U.S.C.A. §§ 1400, et seq. *647 (IDEA), and the Americans with Disabilities Act, 42 U.S.C.A. §§ 12101, et seq. (ADA), thereby also violating his rights of equal protection and due process in contravention of the federal constitution and the Civil Rights Act, 42 U.S.C.A. §§ 1983, et seq. The complaint and amended complaint filed in the federal action detail a series of the Board's actions and inactions starting in 1988 and continuing on a regular basis thereafter that are alleged to constitute "a pattern, practice and custom of egregious" violations of his IDEA and ADA rights, as well as his constitutional rights. R.C. sought compensatory damages for the denial of educational services to which he claims to have been entitled as well as punitive damages. His general assertion was that his past and continuing damages include "financial loss, emotional distress, social isolation, [and] physical pain and suffering...."
The filing of the federal action in 1994 followed what appears to have been a concluded state administrative proceeding commenced in 1992, the facts of which we glean from the deposition of Group's claims representative, Loyal Ownes, and Group's diary narrative respecting that proceeding. Insofar as we are able to determine, R.C. and his mother were dissatisfied with the special educational services being provided him and first sought relief under IDEA from the New Jersey State Department of Education, Division of Special Education in October 1992. As a result of mediation, an apparent agreement was reached between the Board and R.C. in November 1992. Almost immediately after the agreement was reached, R.C. advised the agency that he was withdrawing from mediation and requested a due process hearing to determine his right to a residential placement. A hearing was scheduled for December 18, 1992. When the Board became aware of that development, it so informed Group by letter dated December 9, 1992, advising it that R.C. was seeking residential placement which the Board had estimated as costing about $155,000 a year and further advising Group that it, the Board, could be liable for counsel fees. Group then, under a reservation of rights, agreed to defend but not to indemnify under the so-called B coverage of its errors and omissions policy. In April 1993, the Board advised Group that the matter had been tentatively settled.
In June 1993 Group closed its file, noting that the legal fees incurred were within the policy's deductible. It also appears that sometime prior to that date, an award of counsel fees in R.C.'s favor and against the Board was made by the agency in the amount of $8,000. There are no further illuminating notes in the diary narrative, and Ownes testified on deposition to his recollection that the administrative matter, whose gravamen was R.C.'s right to residential placement, had been resolved during the first half of 1993.
We turn next to the facts respecting the insurance afforded the Board by these defendants. In sum, defendant Group had issued annual CGL and errors and omissions policies to the Board. The term of the last such policies was to expire on January 1, 1994. In the middle of 1993, however, the Board switched its insurance to Selective, which issued the Board a single policy, effective July 1, 1993. That policy, issued for a one-year term, afforded both CGL coverage and errors and omissions coverage. The CGL coverage of both insurers was of the so-called occurrence type, providing coverage for actionable events occurring during the policy term irrespective of when a claim against the Board arising from those events would be made. The errors and omissions coverage, in the nature of educational malpractice insurance, of both carriers was of the claims-made type, affording coverage for claims made against the Board during the policy term irrespective of when the actionable events upon which the claims were based occurred. See generally Zuckerman v. Nat. Union Fire Ins., 100 N.J. 304, 495 A.2d 395 (1985) (explaining and distinguishing between these two basic types of coverage).
Both insurers were timely and appropriately advised of R.C.'s due process hearing request made to the State Department of Education. As noted, the Board so advised Group on December 9, 1992. As to Selective, it appears that when the Board applied for coverage, which was to commence in July 1993, it disclosed all the claims, three in *648 number, that had been made against it in 1992. One of them was the R.C. request for a due process hearing, which we have already described. Accordingly, the errors and omissions policy Selective then issued contained an endorsement excluding claims already made from coverage. The endorsement read as follows:
By this agreement, which becomes part of your policy, issued to you by us, you agree and understand that we have no responsibility to defend, pay on your behalf or indemnify you concerning the pending claims or suits listed below or other proceeding made or brought against you or any other insured under this coverage part.

 DATE OF CLAIM CLAIMANT
 04/02/92 JENNIFER BECHT
 06/05/92 GORDON LEMATTY
 12/09/92 ... [R.C.]

We point out again that as of July 1993 when the Selective policy was issued, the Board apparently believed that the administrative proceedings attendant upon R.C.'s due process hearing request had been concluded and that Group had already closed its file.
Following the institution of R.C.'s federal action in March 1994, the Board sought a defense and indemnity from both insurers under both coverages. Group disclaimed under its occurrence CGL coverage on the ground that R.C.'s complaint did not assert either bodily injury or an occurrence as defined by the policy, and hence that the predicate conditions for invoking that coverage could not be met. It disclaimed under its claims-made errors and omissions coverage on the ground that R.C.'s federal complaint constituted the claim and that claim had not been made until after expiration of the policy term on June 30, 1993. Selective disclaimed under its occurrence CGL coverage for basically the same reasons as relied on by Group. It disclaimed under its errors and omissions coverage on the ground that R.C.'s claim had been specifically excluded by way of the above-described endorsement. This declaratory judgment action ensued.
On the summary judgment motions, the trial judge accepted Selective's position as to both coverages and Group's position as to its CGL coverage. He concluded, however, that under the policy language of Group's claims-made errors and omissions coverage, the November 1992 administrative due process hearing request made by R.C. and the Board's notice thereof to Group in December 1992 encompassed the claims later made by R.C. in the federal action and were hence effective in invoking the coverage. We agree with that holding and with the holding relieving insurers from obligation under their respective CGL coverage. We disagree, however, with the judge's holding relieving Selective from obligation under its errors and omissions coverage.
We consider each of the coverages in the light of the well-settled principles governing the interpretation of insurance contracts. In sum, since contracts of insurance are contracts of adhesion, they are construed favorably to the insured, all ambiguities are resolved in favor of coverage, exclusions and exceptions to coverage are strictly construed, and specific provisions are construed in such a manner as not to defeat the purpose of coverage, all to the end that the reasonable expectations of the insured in purchasing the insurance are met. See, e.g., Princeton Ins. Co. v. Chunmuang, 151 N.J. 80, 95, 698 A.2d 9 (1997); Morton Intern. v. General Acc. Ins., 134 N.J. 1, 76, 629 A.2d 831 (1993), cert. denied, 512 U.S. 1245, 114 S.Ct. 2764, 129 L.Ed.2d 878 (1994); Salem Group v. Oliver, 128 N.J. 1, 4, 607 A.2d 138 (1992); Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992); Sparks v. St. Paul Ins. Co., 100 N.J. 325, 336-338, 495 A.2d 406 (1985); Victory Peach Gr. v. Greater N.Y. Ins., 310 N.J.Super. 82, 89-90, 707 A.2d 1383 (App.Div.1998). We are also mindful of the general rule that the plain meaning of policy language controls. Hence variations in the precise policy language may well dictate disparate outcomes in interpreting seemingly similar coverage. See, e.g., French v. NJ School Bd. Ins. Group, 149 N.J. 478, 494-495, 694 A.2d 1008 (1997).
We address first Group's errors and omissions coverage, the subject of the Group's appeal. The basic coverage statement is as follows:

*649 The Group agrees to pay on behalf of the Insured loss in excess of the applicable deductible and within the limit of liability, both as specified in the Declarations. Such loss must be sustained by the Insured by reason of liability imposed by law for damages caused by a negligent act, error, omission, misstatement or misleading statement of the Insured or any persons for whose acts the Insured is legally liable, arising out of the performance of duties for the Named Insured. This policy will apply only to claims first made against the Insured and reported to the Group during the policy period as specified in the Declarations.
R.C.'s claims made in the federal action patently fall within this coverage statement. The question then is whether these claims were "first made against the Insured and reported to the Group during the policy period...." The answer to this question lies in the manner in which Group had chosen to define "claims" in Section V of the policy. With great precision and sweeping breadth of inclusion, that definition provides that:
Claims first made against the Insured and reported to the Group shall mean that the Insured has received notice of legal process, or that a demand for money or services has been made against the Insured, or that the Insured has become aware of a proceeding, event or development which has resulted in or could in the future result in the institution of a claim against the Insured and that notice has been given in writing to the Group during the policy period. (Emphasis added.)
There is no dispute that in December 1992 the Board gave Group notice of R.C.'s request for a state administrative due process hearing and the potential financial consequences that could flow therefrom, namely the cost of residential placements, an uninsurable obligation of the Board, and an award of counsel fees, apparently within the coverage. There is, however, nothing in the record to suggest that either the Board or the insurer anticipated or should have anticipated that that state administrative proceeding would eventually result in the federal action filed in 1994 in which R.C. sought to impose compensatory and punitive damage liability for wrongful conduct on the Board and its professional personnel. Indeed, the contrary appears to be so as indicated by the apparent settlement between R.C. and the Board and Group's closing of its file in the first half of 1993. Nevertheless, it is also clear that the underlying factual basis of the 1992 state administrative proceeding was precisely the same as the 1994 federal suit, namely, the Board's alleged failure to provide R.C. with the educational services, including residential placement, to which IDEA entitled him. Thus, whether or not anticipated prior to the filing of the federal action, it is nevertheless plain that the "proceeding, event or development" of which the insured gave the insurer notice in 1992 actually did "in the future result in the institution of a claim against the Insured...." And if it did actually so result, then, as provided by the policy and as a matter of logical imperative, it necessarily "could" have so resulted.
Our point, we think, is clear. By its claims-made policy language, Group laid upon the insured the onus of predicting the potential future claim likelihood of all known untoward "proceedings and developments." The simple dispositive fact, then, is that the December 1992 notice by the Board to Group patently met the policy's literal claims-made definition vis-a-vis the ensuing 1994 federal action. As we have had recent occasion to observe, the insured is entitled to all the benefits provided by the fairly-read terms of the policy irrespective of its actual subjective expectations. See Aquilio v. Continental Ins., 310 N.J.Super. 558, 565-566, 709 A.2d 231 (App.Div.1998). The trial judge was, therefore, clearly correct in holding Group in on its errors and omissions policy for calendar year 1992.
We next consider the Selective errors and omissions coverage. First, we reject Selective's assertion that there is some inconsistency, anomaly or even judicial estoppel precluding the Board from arguing that the 1992 notice of R.C.'s administrative action was effective in invoking Group's 1992 claims-made coverage and at the same time asserting that it was the filing of R.C.'s federal action in 1994 that invoked Selective's *650 claims-made coverage. We find no inconsistency or anomaly because, as we have noted, the extent, terms and conditions of policy coverage depend, in the first instance, on the policy language.
The Selective policy language is quite different from the operative Group policy language. The Selective errors and omissions coverage begins with the bold-face, capitalized caution to the insured that the coverage is afforded on a claims-made basis, requiring the claim against the insured to be first made during the policy year.[1] There is no dispute that the substance of R.C.'s claim, namely wrongful acts constituting educational malpractice, is covered by the general terms of that coverage. Nor is there any dispute that the Board, when it gave Selective prompt notice of the filing of R.C.'s federal action, complied with its policy obligation of notifying the insurer, as soon as practicable, "of a `wrongful act' which may result in a claim." The only questions, then, as we view the matter, are first, whether the express exclusion of R.C.'s 1992 claim precludes coverage and second, whether, for purposes of this policy, R.C.'s educational malpractice claims asserted in the federal action were made against the Board in 1992 or 1994. We are also satisfied that the answer to the first question, which we answer in the negative, is dispositive of the second.
As we have pointed out, the express exclusion from the Selective errors and omissions coverage encompassed the "pending claims and suits listed below...." It did not purport to exclude, as was the case of the Group policy, any other event or development known to the Board that could, in the future, possibly ripen into the institution of a claim. That is to say, while the Group policy dealt with possibilities, the Selective policy dealt with probabilities. Moreover, the Selective exclusion was not only express but also of specific limitation. That is to say, all that the policy purported to exclude was the pending claim of R.C., identified as having been made on December 19, 1992. But for purposes of this policy, we are persuaded that that was a different claim from the federal action, which was, of course, not pending in 1992 since it was not instituted until 1994. As we have noted, the federal complaint alleges a series of wrongful acts allegedly committed after conclusion of the administrative proceeding as well as prior thereto. Beyond that, we are persuaded that the obvious procedural, substantive and remedial differences between the state administrative claim and the federal complaint mandate the conclusion that the two claims are different even though they may have arisen from a common factual basis. Thus, the scope of the administrative action was limited to a declaration and enforcement of the Board's obligation under IDEA and ADA to provide R.C. with education services properly responsive to his disabilities and the potential award of counsel fees in R.C.'s favor. See generally J.H.R. v. Bd. of Educ., E. Brunswick, 308 N.J.Super. 100, 705 A.2d 766 (App.Div.1998). The federal action pleads a conglomeration of civil wrongs, not only under the federal education laws and disability laws, but also under the federal constitution and the Civil Rights Act. It does not seek specific enforcement, as it were, of the Board's federally imposed special-education obligations, and it does not seek the remedy of requiring the Board to provide R.C. with a residential placement. Rather, it seeks to impose responsibility for money damages, both compensatory and punitive, not only against the Board but also against eleven of its professional employees, for an alleged course of wrongful conduct, including the alleged failure to have provided residential placement. Obviously the constitutional, civil *651 rights and statutory causes pleaded in the federal action are not within the adjudicatory competence of the agency, and certainly the compensatory and punitive damages sought are beyond its jurisdiction to award. See, e.g., Campione v. Adamar of New Jersey, Inc., 155 N.J. 245, 714 A.2d 299 (1998).
Clearly, it is not every administrative claim seeking the provision of educational services under federal law that eventually develops, as here, into a full-blown, wrongful-conduct, compensatory and punitive damages federal action. And we would venture to assume that such an eventuality is relatively rare, particularly after the administrative proceeding has, as here, apparently resulted in an accommodation of the claim. In short, the Board did not anticipate R.C.'s claims via the federal action when the administrative proceeding was initiated or when the Selective policy was issued and had no apparent reason to do so. Thus, when it agreed to the exclusion of the pending state administrative action from the Selective coverage, it could hardly have expected that that exclusion, after the apparent termination of the administrative proceeding, would continue to apply to all future claims that R.C. might bring irrespective of their scope, the remedy sought and against whom, the causes of action asserted, and the forum applied to. In sum, the Board regarded the federal action as a new claim made in 1994. We are satisfied that in the context of Selective's coverage it was entitled to do so because, in that context, the federal action was a new and different claim from that encompassed by the pending administrative proceeding identified by the exclusion.
We next address the CGL coverage. Both policies cover bodily injury resulting from an occurrence and define a covered occurrence as an "accident." We consider whether the conduct complained of by R.C. in the federal action can be reasonably defined as constituting an accident or accidents for purposes of CGL coverage in light of our understanding that "general liability policies and errors and omissions policies ordinarily cover and are intended to cover different categories of risk." Search EDP v. American Home Assur., 267 N.J.Super. 537, 541, 632 A.2d 286 (App.Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994). We think it plain that the Board expressed its understanding of this distinction in its purchase of both types of coverage. We also think it plain that the conduct of the Board and its personnel of which R.C. complains in his federal action is classically "errors or omissions" in the insurance sense. What R.C. challenges is the Board's exercise of professional judgment in responding to his special educational needs attendant upon his multiple handicaps. Whether that exercise of judgment was just plain mistaken or was actually intended to deprive R.C. of federally-declared rights is beside the point. The point is that there was patently nothing "accidental" in the events here, either in terms of the acts alleged to have been committed by the Board or the damage to R.C. allegedly resulting thereon. See Voorhees v. Preferred Mut. Ins. Co., supra, 128 N.J. at 181, 607 A.2d 1255. We do not intend to suggest that errors of professional judgment and accidents are always mutually exclusive concepts. But we are persuaded here that the two coverages, in these circumstances, were not intended to be overlapping or duplicative, that the insured itself so understood and expected, and that a fair reading of the policy language squarely places the conduct here complained of only in the errors and omissions category. We need not, therefore, address the question of whether, to the extent R.C. has alleged resultant emotional distress and physical pain and suffering in the federal complaint, the bodily injury component of the coverage predicate has been met.
The summary judgment appealed from, to the extent it imposes upon defendant New Jersey School Boards Association Insurance Group the obligation to afford plaintiff a defense and indemnity under its errors and omissions coverage, but not under its general liability coverage, is affirmed. The summary judgment, to the extent it relieves defendant Selective Insurance from affording a defense and indemnity under its general liability coverage, is affirmed, but to the extent it relieves Selective Insurance from affording a defense and indemnity under its errors and omissions coverage, is reversed. We remand *652 for entry of judgment consistent with this opinion.
NOTES
[1] We note that the coverage also requires that the wrongful act must also have been committed in the policy year. That is the clear import of the provision that the wrongful act must have been committed on or after the retroactive date stated in the policy schedule. The stated date in the referred to item 5. of the schedule is the inception date of the policy, July 1993. Selective has not argued that that provision precludes coverage, and we note that the Supreme Court has held, in Sparks v. St. Paul Ins. Co., 100 N.J. 325, 339, 495 A.2d 406 (1985), that a limitation in a claims-made policy to conduct occurring during the policy term is unenforceable as violative of the purpose of the coverage since it defeats the insured's reasonable expectations and results, contrary to public policy, in coverage that "provides neither the prospective coverage typical of an `occurrence' policy, nor the `retroactive' coverage typical of a `claims-made' policy."