23 A.3d 338

MAGDY ABOUZAID, AS GUARDIAN AD LITEM FOR MOUSTAFA ABOUZEID, A MINOR CHILD; MANAL ABOUZEID, EMADILDIN OSMAN, AS GUARDIAN AD LITEM FOR OMAR OSMAN; AND EMAN KANDIL, PLAINTIFFS, v. MANSARD GARDENS ASSOCIATES, LLC; JACK POMERANC; SALLY POMERANC; JONATHAN CHAVIANO, DEFENDANTS.

MANSARD GARDENS ASSOCIATES, LLC, JACK POMERANC AND SALLY POMERANC, THIRD–PARTY PLAINTIFFS–APPELLANTS, v. GREATER NEW YORK MUTUAL INSURANCE COMPANY, THIRD–PARTY DEFENDANT–RESPONDENT.

Argued January 19, 2011—Decided June 21, 2011.

*Alan H. Bernstein* argued the cause for appellants (*Brach Eichler,* attorneys; *Mr. Bernstein* and *David J. Klein,* on the brief).

*Michael J. Marotte* argued the cause for respondent (*Schenck, Price, Smith & King,* attorney; *Mr. Marotte* and *James A. Kassis,* on the brief).

Justice LONG delivered the opinion of the Court.

The question presented on this appeal is whether a *Portee*[1] claim that does not allege physical sequelae triggers the duty to defend under a "bodily injury" provision in a commercial general liability insurance policy. In *Voorhees v. Preferred Mutual Insurance Co.,* 128 *N.J.* 165, 607 *A.2d* 1255 (1992), we held that a "bodily injury" provision affords coverage for an emotional distress claim accompanied by physical manifestations. *Id.* at 169, 607 *A.2d* 1255. We also required the insurer to defend the complaint for emotional distress, which did not allege physical injury, at least until physical manifestation was disproved or otherwise dropped out of the case. The rationale for the requirement of defense was the existence of a "potentially" covered claim. *Id.* at 174–75, 607 *A.2d* 1255. Because a *Portee* claim may, but need not, involve physical sequelae, such a claim is potentially, but not necessarily, covered by a "bodily injury" provision. In such

---

[1] *Portee v. Jaffee,* 84 *N.J.* 88, 101, 417 *A.2d* 521 (1980) (establishing elements of negligent infliction of emotional distress claim based on witnessing injury to family member).

circumstances, the burden of defense must be borne by the insurer until the question of physical injury clearly drops out of the case.

## I.

In 2007, defendants, Jack and Sally Pomeranc, d/b/a Mansard Gardens Associates, LLC (Mansard), were the owners of an apartment building on West 23rd Street in Bayonne, New Jersey. At the time, Greater New York Mutual Insurance Company (GNY) was Mansard's insurer under a commercial general liability insurance policy (Policy). The Policy provided, in relevant part:

SECTION I—COVERAGES

COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY

1. Insuring Agreement

a. We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply . . . .

. . . .

b. This insurance applies to "bodily injury" and "property damage" only if:

(1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; and

(2) The "bodily injury" or "property damage" occurs during the policy period.

c. Damages because of "bodily injury" include damages claimed by any person or organization for care, loss of services or death resulting at any time from the "bodily injury[."]

. . . .

SECTION V—DEFINITIONS

. . . .

3. "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

. . . .

13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

Plaintiffs Magdy and Manal Abouzaid[2] and their minor son, Moustafa, were tenants in Mansard's second-floor apartment on August 22, 2007. Plaintiff Eman Kandil was visiting the Abouzaids' home with her sons, Omar and Tarek Osman, on that date. Earlier that day, Jonathan Chaviano performed repairs in the Abouzaids' apartment on behalf of Mansard. Chaviano applied liquid paint thinner to the kitchen floor to remove tile adhesive and then left the room. A flash fire erupted when vapors from the paint thinner were ignited by the stove's pilot light.

The fire spread rapidly through the apartment and Moustafa, Omar, and Tarek (collectively "minor plaintiffs") were trapped by the flames. Moustafa sustained first-degree burns to his lower torso and second-degree burns to his left foot. Omar suffered burns on the top of his left foot. Tarek's injuries are not specified. The children's mothers, Manal Abouzaid and Eman Kandil (collectively "plaintiffs"), heard the explosion and saw their sons "engulfed by a fireball." The flames did not physically injure the women.

On June 2, 2008, Magdy Abouzaid and Emadildin Osman, the fathers of the minor plaintiffs, sued Mansard as *guardians ad litem* for their sons. The boys' mothers also joined the complaint as individual plaintiffs.

The complaint alleged three counts of tortious activity by Mansard. Count I was a negligence claim for Mansard's alleged breach of the duty of reasonable care, which resulted in physical injury to the minor plaintiffs who "experienced pain and suffering, loss of enjoyment of life," and "were caused to undergo medical treatment," which resulted in "expenses to their caregivers, scarring, and emotional injury." Count II, based on the theory of *res ipsa loquitur*, alleged that a fire caused by flammable vapors

---

[2] The complaint spells the surname of plaintiffs Manal and Moustafa seemingly interchangeably as both Abouzeid and as Abouzaid. Plaintiff Magdy's surname is spelled solely as Abouzaid. In the interest of consistency, we assume the surname of the family is Abouzaid.

"does not occur in the absence of negligence," and that Mansard was responsible because it controlled the chemical catalyst. For both Counts I and II, plaintiffs demanded "judgment for compensatory damages, including pain and suffering, disability, any medical or economic losses, interests and costs of suit, and all other relief the Court deems equitable and just." Count III asserted claims of emotional distress suffered by plaintiffs and is the source of the present controversy. It stated:

> Solely as a result of defendants' negligent conduct, plaintiffs[ ] Manal [Abouzaid] and Eman Kandil have been forced to endure *emotional distress and suffering resulting from watching . . . their sons[ ] becoming engulfed by flames[.]*
>
> WHEREFORE, the plaintiffs demand judgment for compensatory damages, including pain and suffering, impairment, disability, loss of enjoyment of life, any medical or economic losses, interests and costs of suit, and all other relief the Court deems equitable and just.
>
> [ (Emphasis added).]

Count III did not allege physical injury to plaintiffs or specify that their alleged emotional distress was accompanied by physical manifestations.

Mansard forwarded the complaint to its insurer, GNY, which responded on August 18, 2008, by issuing a "reservation of rights and partial disclaimer." GNY agreed to provide a limited defense in the underlying litigation, but denied coverage and representation for the claims asserted in Count III. GNY explained that the emotional distress claims in Count III did not satisfy the "bodily injury" requirement and therefore fell outside the coverage of the Policy. GNY also reserved the right to deny coverage for the minor plaintiffs' claims of emotional injury included in Count I "in the event that there is no physical manifestation of the emotional injury."

Mansard then retained independent counsel who filed an answer to Count III and a third-party complaint against GNY, asserting that it was obligated to defend against Count III. On December 31, 2008, GNY filed a motion to dismiss the third-party complaint on the grounds that Mansard failed to state a cause of action. On January 15, 2009, while GNY's motion was still pending, Mansard

filed a summary judgment motion to dismiss the emotional distress claim as inadequately pled.

On February 27, 2009, the trial court denied both summary judgment motions, reasoning that it was premature to dismiss Mansard's third-party complaint against GNY regarding coverage, and that plaintiffs had asserted a viable negligent infliction of emotional distress claim under *Portee*.

On March 18, 2009, Mansard moved for summary judgment against GNY and for the award of counsel fees pursuant to *Rule* 4:42–9(a)(6). On April 7, 2009, GNY filed a cross-motion for reconsideration of the February 27, 2009, order denying its motion to dismiss the third-party complaint.

As Mansard and GNY awaited the return date for their dueling motions, the trial court permitted plaintiffs to file an amended complaint in the underlying action. The amended complaint revised Count III to read as follows: "Plaintiffs Manal [Abouzaid] and Eman Kandil have had to incur the cost of medical treatment for the *physical impact* caused by their emotional distress and suffering." (Emphasis added).

On May 1, 2009, based on plaintiffs' amended complaint, GNY issued a "supplemental notice of reservation of rights" expanding its defense to include the amended third count, while reserving the right to deny coverage if investigation revealed that the emotional distress was not "accompanied by a physical manifestation of the injury." Thus, GNY agreed to provide Mansard with a defense for all three counts from the date of notice of the amended complaint.

That same day, the trial court granted Mansard's motion for summary judgment on the coverage issue, declaring that the duty to defend was triggered by the initial complaint. The trial court also denied GNY's motion for reconsideration of its February 27, 2009, denial of GNY's motion for summary judgment.

Ultimately, a plenary hearing was conducted on Mansard's application for counsel fees expended in defense of Count III of

the original complaint. On July 31, 2009, the trial court awarded Mansard fees and costs in the amount of $38,345.75. GNY appealed.[3]

The Appellate Division reversed the trial court's decision regarding defense and counsel fees. In so doing, the panel ordered the dismissal of Mansard's third-party complaint with prejudice, and reversed the award of fees and costs. According to the panel, plaintiffs' assertion of a *Portee* claim, without a reference to related physical injury, was insufficient to trigger coverage for "bodily injury" under the Policy. The panel reasoned that nothing in *Portee* or its subsequent jurisprudence demands "a physical manifestation as a required element of [a negligent infliction of emotional distress] cause of action." As such, the panel found that GNY was not obligated to defend Mansard until plaintiffs amended Count III to include an allegation of "physical impact." We granted Mansard's petition for certification, *Abouzaid v. Mansard Gardens Associates, LLC,* 205 *N.J.* 14, 11 *A.*3d 373 (2010), and now reverse.

## II.

Mansard argues that a *Portee* claim, by its very nature, involves a physical manifestation; that the assertion of a *Portee* claim thus triggers a duty to defend under an insurance policy covering "bodily injury"; and that, in any event, under *Voorhees* an insurer must defend a *Portee* claim until the question of physical injury clearly drops out of the case.

GNY counters that the Appellate Division properly determined that the Policy did not provide coverage for emotional distress claims unaccompanied by an allegation of resulting physical harm; that *Portee* claims do not require the assertion of physical harm and thus do not trigger the duty to defend under an insurance

---

[3] The Abouzaids, Osmans, and Kandil are not parties to this appeal, although it was their original complaint that initiated the present insurance litigation between Mansard and GNY.

policy covering only "bodily injury"; that Mansard erroneously interprets this Court's case law to create a duty to defend purely emotional claims; and that emotional distress claims must be accompanied by allegations of physical manifestations to trigger coverage under an insurance policy covering only "bodily injury."

### III.

The history of the tort of negligent infliction of emotional distress has had many twists and turns. Historically, under *Ward v. W. Jersey & Seashore R.R. Co.*, 65 *N.J.L.* 383, 47 *A.* 561 (Sup.Ct.1900), a plaintiff could not recover for emotional distress resulting from negligent conduct without the showing of a contemporaneous physical injury. *Id.* at 384–86, 47 *A.* 561; *see also Tuttle v. Atlantic City R.R. Co.*, 66 *N.J.L.* 327, 331, 49 *A.* 450 (E. & A.1901); *Greenberg v. Stanley*, 51 *N.J.Super.* 90, 106, 143 *A.2d* 588 (App.Div.1958); *Justesen v. Pa. R.R. Co.*, 92 *N.J.L.* 257, 260, 106 *A.* 137 (Sup.Ct.1919). That so-called "physical impact" requirement had several underpinnings. As we recently said in *Jablonowska v. Suther*, 195 *N.J.* 91, 948 *A.2d* 610 (2008):

> Underlying the insistence on a physical-impact requirement was a syllogistic logic. Individuals are responsible only for the "natural and proximate results of [their] negligent act[s]," and "[p]hysical suffering is not the probable or natural consequences of fright," so a plaintiff cannot recover for an injury caused by fright alone. *Ward, supra,* 65 *N.J.L.* at 385, 47 *A.* 561 (emphasis omitted). From a policy standpoint, courts also feared a "flood of litigation[ ] in cases where the injury complained of may be easily feigned without detection, and where the damages must rest upon mere conjecture and speculation." *Id.* at 386, 47 *A.* 561; *see also Restatement (Second) of Torts* § 436A comment b (1965) (discussing skepticism of claims for emotional disturbance absent physical injury).
>
> [*Id.* at 102, 948 *A.2d* 610.]

"With the passage of time and the decisions in a series of cases in which practically nonexistent impact was the peg upon which recovery for serious emotional disturbance was allowed, the impact rule came under nearly universal criticism." *Strachan v. John F. Kennedy Mem'l Hosp.*, 209 *N.J.Super.* 300, 334, 507 *A.2d* 718 (App.Div.1986) (citing Comment, *Negligently Inflicted Mental Distress: The Case for an Independent Tort*, 59 *Geo. L.J.* 1237

(1971)), *aff'd in part and rev'd in part,* 109 *N.J.* 523, 538 *A.*2d 346 (1988).

■ Eventually, the physical impact requirement fell by the wayside. In *Falzone v. Busch,* 45 *N.J.* 559, 214 *A.*2d 12 (1965), we rejected the reasons previously advanced by courts in support of the physical impact rule as no longer "tenable." *See id.* at 563–69, 214 *A.*2d 12. As we explained in *Portee:*

> The first reason—that physical injury was presumed not to be a probable or natural consequence of fright—was perceived by the Court as an issue to be resolved by medical evidence, not judicial presumption. The *Falzone* Court rejected the second reason—that there was a lack of precedent or consensus in favor of recovery—as specious. The final reason traditionally advanced against liability was the prospect of recovery based on conjecture and speculation and a consequent flooding of the courts with groundless litigation. The *Falzone* Court responded by observing that the civil litigation process would safeguard against spurious and even fraudulent claims. Finding the conventional rationales to be insufficient, the Court overruled *Ward* and held that "where negligence causes fright from a reasonable fear of immediate personal injury," the frightened person could recover damages for any resulting "substantial bodily injury or sickness."
> [*Portee, supra,* 84 *N.J.* at 93, 417 *A.*2d 521 (citations omitted).]

*Falzone* adopted what was denominated the "zone of danger" rule, which recognized that immediate fear of personal injury could serve as the basis for recovery for emotional distress from negligent conduct so long as "substantial bodily injury or sickness" resulted. *Falzone, supra,* 45 *N.J.* at 569, 214 *A.*2d 12. That remains our law today. *Jablonowska, supra,* 195 *N.J.* at 104, 948 *A.*2d 610.

■ One form of the tort of negligent infliction of emotional distress is the so-called *Portee* claim. In *Portee,* this Court recognized a cause of action for the unique emotional distress suffered by a bystander when it considered the experience of a mother as she watched her seven-year-old son die an excruciating death, trapped in a malfunctioning elevator. *Portee, supra,* 84 *N.J.* at 91–92, 101, 417 *A.*2d 521. The claim recognized in *Portee* does not mandate direct physical impact or threat of injury to the family member/bystander, nor does it require physical injury to result from the emotional distress. *Id.* at 101, 417 *A.*2d 521. To the contrary, we distinguished the facts before us from the generic

interest in "emotional tranquility" that is the hallmark of an emotional distress claim, basing our conclusion on the "profound and abiding sentiment of parental love" and the fact that "no tragedy is more wrenching than the helpless apprehension of the death or serious injury of one whose very existence is a precious treasure." *Id.* at 97–99, 417 *A.*2d 521. To recognize a remedy for such a foreseeable outcome from a breach of a duty of care and, at the same time, to "avoid[ ] speculative results or punitive liability," *id.* at 97, 417 *A.*2d 521, we declared:

> The cause of action we approve today for the negligent infliction of emotional distress requires proof of the following elements: (1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress.
>
> [*Id.* at 101, 417 *A.*2d 521.]

In ruling, we specifically recognized that severe "mental and emotional harm," standing alone, can trigger *Portee* recovery. That distinguishes such a claim from ordinary emotional distress, which requires substantial bodily injury or sickness to survive. *Compare ibid., with Falzone, supra,* 45 *N.J.* at 569, 214 *A.*2d 12. Although *Portee* plaintiffs have a right to assert physical harms associated with emotional distress, the unique emotional distress injuries contemplated by *Portee* need not be paired with physical conditions in order to be pursued.[4] In short, although a *Portee*

---

[4] *See Carey v. Lovett,* 132 *N.J.* 44, 62, 622 *A.*2d 1279 (1993) (requiring a plaintiff to show her emotional distress was so extreme that it "resulted in physical manifestations *or* . . . destroyed . . . basic emotional security" (emphasis added)); *see also Dunphy v. Gregor,* 136 *N.J.* 99, 106–08, 642 *A.*2d 372 (1994) (restating narrow application of *Portee* test to claims of emotional distress and requiring a "strong showing that the emotional injury be severe"); *Aly v. Garcia,* 333 *N.J.Super.* 195, 204–05, 754 *A.*2d 1232 (App.Div.2000) (denying recovery to plaintiffs who did not demonstrate emotional distress that was "sufficiently substantial to result in physical illness[ ] *or* a mental condition of a type which may be generally recognized and diagnosed by clinicians" (emphasis added)), *certif. denied,* 167 *N.J.* 87, 769 *A.*2d 1050 (2001); *Schillaci v. First Fid. Bank,* 311 *N.J.Super.* 396, 406, 709 *A.*2d 1375 (App.Div.1998) (denying recovery for emotional distress where plaintiff failed to show "physical illness or serious psychological sequelae" (emphasis added) (quoting *Lingar v. Live–In Companions, Inc.,*

claim may assert a physical injury, it need not do so—serious psychological damage will suffice.

## IV.

At issue in this case is whether an insurer must defend a *Portee* claim under a "bodily injury" provision in a commercial general liability insurance policy. To answer that question, some basic principles require review.

An insurer is contractually obliged to provide the insured with a defense against all actions covered by the insurance policy. *Hartford Accident & Indemn. Co. v. Aetna Life & Cas. Ins. Co.,* 98 *N.J.* 18, 22, 483 *A.*2d 402 (1984). The duty to defend is triggered by the filing of a complaint alleging a covered claim. *Voorhees, supra,* 128 *N.J.* at 173, 607 *A.*2d 1255; *Danek v. Hommer,* 28 *N.J.Super.* 68, 77, 100 *A.*2d 198 (App.Div.1953), *aff'd o.b.,* 15 *N.J.* 573, 105 *A.*2d 677 (1954); *L.C.S., Inc. v. Lexington Ins. Co.,* 371 *N.J.Super.* 482, 490, 853 *A.*2d 974 (App.Div.2004). Consequently, when the complaint raises allegations that fall within a risk covered by the insurance contract, the insurer has a duty to defend. *Aetna Cas. & Sur. Co. v. Ply Gem Indus., Inc.,* 343 *N.J.Super.* 430, 452, 778 *A.*2d 1132 (App.Div.), *certif. denied,* 170 *N.J.* 390, 788 *A.*2d 774 (2001).

As a practical matter, the determination of an insurer's duty to defend requires review of the complaint with liberality to ascertain whether the insurer will be obligated to indemnify the insured "if the allegations are sustained." *See Danek, supra,* 28 *N.J.Super.* at 77, 100 *A.*2d 198; *see also Hartford Ins. Grp. v. Marson Constr. Corp.,* 186 *N.J.Super.* 253, 260, 452 *A.*2d 473 (App.Div.1982), *certif. denied,* 93 *N.J.* 247, 460 *A.*2d 656 (1983). "[T]he complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment, and in

300 *N.J.Super.* 22, 27, 692 *A.*2d 61 (App.Div.1997)) (internal quotation marks omitted)).

reaching a conclusion, doubts should be resolved in favor of the insured." *Danek, supra,* 28 *N.J.Super.* at 77, 100 *A.*2d 198. Thus, if "the complaint comprehends an injury which *may* be within the policy," a duty to defend will be found. *Id.* at 78, 100 *A.*2d 198 (emphasis added) (quoting *Lee v. Aetna Cas. & Sur. Co.,* 178 *F.*2d 750, 753 (2d Cir.1949)). In other words, "potentially coverable" claims require a defense. *See Stafford v. T.H.E. Ins. Co.,* 309 *N.J.Super.* 97, 103, 706 *A.*2d 785 (App.Div.1998) ("[A] duty to defend clause is enforceable if there is a 'potentially-coverable occurrence' that would be indemnified if proved valid.").

That is the nearly-universal rule among our sister jurisdictions as well.[5] Indeed,

> [t]here is impressive and substantial support among the judicial precedents for an expansive view of the duty to defend when the third party's pleadings are ambiguous in regard to either the possible theories of liability or some fact that is central to the existence of coverage. In such cases, the courts typically reason that the ambiguity in the pleadings indicates that there is a possibility of liability and that therefore the obligation to defend exists in these circumstances in the same way it does when there is at least one claim in the complaint that would be covered.

---

[5] *See* 3–19 Sherilyn Pastor, *New Appleman on Insurance Law Library Edition* § 19.04 at n. 63 (citing *Air Prods. & Chems., Inc. v. Hartford Accident & Indem. Co.,* 25 *F.*3d 177, 180 (3d Cir.1994); *Montrose Chem. Corp. v. Superior Court,* 6 *Cal.*4th 287, 24 *Cal.Rptr.*2d 467, 861 *P.*2d 1153, 1161 (1993)); *see also, e.g., Harken Exploration Co. v. Sphere Drake Ins. PLC,* 261 *F.*3d 466, 471 (5th Cir.2001) (stating duty to defend is triggered "if there is, potentially, a case under the complaint within the coverage of the policy" (citation and internal quotation marks omitted)); *Rhodes v. Chicago Ins. Co.,* 719 *F.*2d 116, 119 (5th Cir.1983) ("When the alleged cause of action is neither clearly without nor clearly within coverage, the insurer is obligated to defend if there is, potentially, a cause under the complaint within the coverage of the policy." (citation and internal question marks omitted)); *Delgado v. Interinsurance Exch. of Auto. Club of S. California,* 47 *Cal.*4th 302, 97 *Cal.Rptr.*3d 298, 211 *P.*3d 1083, 1086 (2009) ("To prevail in an action seeking declaratory relief on the question of the duty to defend, the insured must prove the existence of a *potential for coverage,* while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*" (citation and internal quotation marks omitted)); *U.S. Fid. & Guar. Co. v. Wilkin Insulation Co.,* 144 *Ill.*2d 64, 161 *Ill.Dec.* 280, 578 *N.E.*2d 926, 930 (1991) ("If the underlying complaints allege facts within or *potentially* within policy coverage, the insurer is obliged to defend its insured even if the allegations are groundless, false, or fraudulent.").

> Thus, when any doubt about coverage is produced by ambiguities in the complaint—that is, "where the complaint does not state facts with sufficient definiteness to clearly bring the claim within or without coverage of the policy . . ."—that doubt is resolved so as to "trigger" the insurer's obligation to provide a defense if there is potentially a basis of liability within the scope of the insurance coverage.
>
> [Robert R. Keaton & Alan L. Widiss, *Insurance Law, A Guide to Fundamental Principles, Legal Doctrines and Commercial Practices* 1020–21 (1988) (footnotes omitted).]

 Notably, the potential merit of the claim is immaterial: the duty to defend "is not abrogated by the fact that the cause of action stated cannot be maintained against the insured either in law or in fact—in other words, because the cause is groundless, false or fraudulent." *Danek, supra,* 28 *N.J.Super.* at 77, 100 *A.*2d 198. Moreover, the duty to defend remains even if the asserted claims are "poorly developed and almost sure to fail." *Voorhees, supra,* 128 *N.J.* at 174, 607 *A.*2d 1255.

 Although courts generally look to the complaint to ascertain the duty to defend, the analysis is not necessarily limited to the facts asserted in the complaint. *See id.* at 174–75, 607 *A.*2d 1255; *SL Indus. v. Am. Motorists Ins. Co.,* 128 *N.J.* 188, 198–99, 607 *A.*2d 1266 (1992); *Jolley v. Marquess,* 393 *N.J.Super.* 255, 271–72, 923 *A.*2d 264 (App.Div.2007). Thus, for example, an insurer's duty to provide a defense may also be triggered by "facts indicating potential coverage that arise during the resolution of the underlying dispute." *SL Indus., supra,* 128 *N.J.* at 198, 607 *A.*2d 1266. That notion is said to align with the expectations of insureds, who "expect their coverage and defense benefits to be determined by the nature of the claim against them, not by the fortuity of how the plaintiff, a third party, chooses to phrase the complaint against the insured." *Id.* at 198–99, 607 *A.*2d 1266.

## V.

With those principles in mind, we turn to our most recent forays into the subject of defense of an emotional distress claim. In *Voorhees,* we interpreted a "bodily injury" provision, nearly identical to the one before us, which obligated the insurer to:

pay ... all sums for which any *insured* is legally liable because of *bodily injury* ... caused by an *occurrence* to which this coverage applies[, and to] defend any suit seeking damages, provided the suit results from *bodily injury* ... not excluded under this coverage.

[*Voorhees, supra,* 128 *N.J.* at 171, 607 *A.*2d 1255.]

In its definitions section, the policy stated that

*Bodily injury* means bodily harm, sickness or disease to a person including required care, loss of services and death resulting therefrom.

[*Ibid.*]

Voorhees was sued by her child's teacher after she questioned the teacher's "competency and fitness." *Id.* at 169, 607 *A.*2d 1255. The complaint alleged that Voorhees made false statements about the teacher, putting her in false light, interfering with her right to privacy, and inflicting "humiliation, embarrassment, emotional distress and mental anguish." *Id.* at 170, 607 *A.*2d 1255. Although no physical symptoms were alleged in the complaint, the teacher's answers to interrogatories later revealed that her distress resulted in "an undue amount of physical complaints, including headaches, stomach pains, nausea, ... [and] body pains." *Id.* at 171, 607 *A.*2d 1255 (internal quotation marks omitted).

When Voorhees unsuccessfully sought a defense from her insurer, she settled the underlying case and later sued the insurer for legal expenses. *Ibid.* The trial court granted summary judgment in favor of the insurer, finding that the teacher's complaint alleged defamation, which was not covered under the "bodily injury" policy. *Id.* at 171–72, 607 *A.*2d 1255.

Voorhees appealed. Over a dissent, the appellate panel reversed, declaring that the teacher's complaint alleged both outrage and negligent infliction of emotional distress, "causes of action that would be covered under the phrase 'bodily injury.' " *Id.* at 172, 607 *A.*2d 1255. The panel held that, although the teacher's allegations were weak, the pleadings stated covered claims and the insurer had a duty to defend Voorhees. *Ibid.* The dissenter contended that emotional distress claims did not fall within the protections of a "bodily injury" policy. *Ibid.*

The insurer appealed as of right on the issue of whether the teacher's complaint asserted a covered claim that triggered the duty to defend. *Id.* at 173, 607 *A.*2d 1255. Speaking directly to the complaint, we said:

> There is little dispute that the complaint was inartfully drafted. It does not clearly articulate the facts necessary to prove any specific cause of action. The duty to defend, however, is determined by *whether* a covered claim is made, not by how well it is made. A third party does not write the complaint to apprise the defendant's insurer of potential coverage; fundamentally, a complaint need only apprise the opposing party of disputed claims and issues. *Jardine Estates, Inc. v. Koppel,* 24 *N.J.* 536, 542, 133 *A.*2d 1 (1957); *Miltz v. Borroughs–Shelving,* 203 *N.J.Super.* 451, 458, 497 *A.*2d 516 (App.Div.1985).
>
> As written, the complaint alleges outrage and negligent infliction of emotional distress just as convincingly or unconvincingly as it does defamation. It states that Voorhees made statements "serving to ... inflict upon her humiliation, embarrassment, emotional distress and mental anguish," and that Voorhees' conduct was "willful[ ], deliberate[ ], reckless[ ], and negligent[ ]." The complaint notified [Voorhees's insurer] that plaintiff would argue multiple, alternative causes of action, potentially including, but not limited to, defamation.
>
> [*Id.* at 174–75, 607 *A.*2d 1255.]

We then turned to the question of coverage under the "bodily injury" provision and concluded that:

> the term "bodily injury" is ambiguous as it relates to emotional distress accompanied by physical manifestations. That ambiguity should be resolved in favor of the insured. [*Sparks v. St. Paul Ins. Co.,* 100 *N.J.* 325, 336, 495 *A.*2d 406 (1985) ]. Moreover, we find such an interpretation to be in accord with the insured's objectively-reasonable expectations. That "emotional distress can and often does have a direct effect on other bodily functions" is well recognized. [*NPS Corp. v. Ins. Co. of N. Am.,* 213 *N.J.Super.* 547, 553, 517 *A.*2d 1211 (App.Div.1986) ]. An insured who is sued on account of an injury involving physical symptoms could reasonably expect an insurance policy for liability for bodily injuries to provide coverage.
>
> [*Id.* at 177–78, 607 *A.*2d 1255.]

In terms of defense, we added:

> Because the teacher demonstrated that she was suing Voorhees for bodily injuries incurred as a result of her emotional distress, [Voorhees's insurer] was obligated to defend her unless and until the physical ailments were disproved or the underlying allegations were dismissed.
>
> [*Id.* at 180, 607 *A.*2d 1255.]

Although that language is open to interpretation, in ruling as we did regarding the defense of the emotional distress claim, it is critical that we did not distinguish between the point at which the

complaint alleging emotional distress was originally filed and the later point at which the teacher's answers to interrogatories first raised the issue of physical sequelae directly. In other words, in *Voorhees,* we required the insurer to defend the complaint from the time of its filing although it did not clearly state a claim for emotional distress with physical manifestations.

The same day that we decided *Voorhees,* we issued our opinion in *SL Industries. SL Indus., supra,* 128 *N.J.* at 193, 607 *A.*2d 1266. There, Newell E. Whitcomb, a vice-president of SL Industries, was told that the company intended to eliminate his position. *Id.* at 193, 607 *A.*2d 1266. As a result, he agreed to retire early. *Id.* at 193–94, 607 *A.*2d 1266. As it turned out, the company hired a new executive who Whitcomb contended was actually intended as his replacement. *Id.* at 194, 607 *A.*2d 1266. Whitcomb claimed that the assertion that his position was to be eliminated was a pretext to force him out. *Ibid.* In January 1986, he sued SL Industries for willful age discrimination under the Age Discrimination in Employment Act (ADEA), 29 *U.S.C.A.* §§ 621 to 634, and common-law fraud. *Ibid.*

SL Industries was covered under a policy that contained nearly the same definition of "bodily injury" as in *Voorhees* and here. *Ibid.* When SL Industries sought a defense against Whitcomb's claims, the insurance company declined, arguing that SL Industries' "bodily injury" policy did not cover liability for Whitcomb's claims. *Id.* at 195, 607 *A.*2d 1266.

In Whitcomb's answers to interrogatories in June 1986, he stated that he had "suffered loss of sleep, loss of self-esteem, humiliation and irritability." *Id.* at 195, 198, 607 *A.*2d 1266 (internal quotation marks omitted). He supplemented his response averring that he had "received treatment for his emotional pain and suffering." *Id.* at 195, 607 *A.*2d 1266 (internal quotation marks omitted). Whitcomb renewed those complaints in his pretrial stipulation. *Ibid.* Thereafter, Whitcomb and SL Industries settled. *Ibid.*

SL Industries brought suit against its insurer seeking a declaration that Whitcomb's claims were covered by its "bodily injury" policy and also sought compensatory, punitive, and other forms of relief. *Id.* at 195–96, 607 *A.*2d 1266. A Law Division judge granted the insurer's motion for summary judgment, holding "that the complaint did not obligate [the insurer] to defend the underlying suit because it did not state any claims falling within the terms of the [policy]." *Id.* at 196, 607 *A.*2d 1266. The appellate panel reversed, holding that once the insurer "possessed knowledge of Whitcomb's claim for emotional damages, its duty to defend was triggered under the terms of the [policy]." *Ibid.* (citation and internal quotation marks omitted). The appellate panel also concluded that Whitcomb's claims qualified as "bodily injury" under the policy. *Ibid.*

The insurer appealed on the issue of whether it had a duty to defend SL Industries based on the information included in Whitcomb's complaint. *Id.* at 193, 197, 607 *A.*2d 1266. We first turned to the ADEA, which "does not allow the recovery of compensatory damages for emotional injuries caused by age discrimination." *Id.* at 197, 607 *A.*2d 1266. As a result, we held that the insurance policy would not cover such claims. *Id.* at 198, 607 *A.*2d 1266. Likewise, with respect to the common-law fraud claim, we held that the complaint could not have "alerted the insurance company that the fraud had led to bodily ... injuries potentially covered under the [policy]." *Id.* at 198, 607 *A.*2d 1266. Thus, as of the filing of the complaint, no potential "bodily injury" claim was asserted. *Ibid.*

However, in *SL Industries* we recognized that facts outside of the complaint could also trigger a duty to defend and stated that insurers, therefore, cannot "construct a formal fortress of the third party's pleadings and ... retreat behind its walls, thereby successfully ignoring true but unpleaded facts within its knowledge that require it, under the insurance policy, to conduct the putative insured's defense." *Id.* at 199, 607 *A.*2d 1266 (citation and internal quotation marks omitted). We concluded that

[b]ecause the complaint contained the only information [the insurer] had about the underlying suit, and because the complaint did not allege any covered injuries triggering the duty to defend, *[the insurer's] May 1986 decision not to defend the action was appropriate.* However, by June 1986 SL Industries had learned of additional facts that potentially triggered [the insurer's] duty to defend. In his response to interrogatories, dated June 1986, Whitcomb stated that as a result of SL Industries' treatment of him he "suffered loss of sleep, loss of self-esteem, humiliation, and irritability."
[*Id.* at 198, 607 *A*.2d 1266 (emphasis added).]

We then reviewed the merits of Whitcomb's "bodily injury" claim to decide whether SL Industries was entitled to a defense as of June 1986, when Whitcomb answered the interrogatories, and concluded that his allegation of "sleeplessness" was not of such a nature as to trigger "bodily injury" defense and coverage. *Id.* at 201–02, 607 *A*.2d 1266.

Thus, in both *Voorhees* and *SL Industries*, we recognized the relevance of after-acquired information to the duty to defend analysis. However, in terms of result, in *SL Industries* we held that the insurer was not required to defend the complaint upon filing, whereas in *Voorhees* we ruled to the contrary. The difference between *Voorhees* and *SL Industries*, which were penned by the same Justice of this Court, is straightforward and is based on the principle that the duty to defend arises where a claim is potentially coverable. Where, as in *Voorhees*, the complaint presented the possibility of a covered claim, defense was required *ab initio*. Contrariwise, where, as in *SL Industries*, the complaint excluded the potential for a covered claim, no defense was warranted. Those cases are entirely in synchronicity with each other and provide a bulwark for insurers against the requirement that they defend claims that are clearly outside the contract of insurance while, at the same time, guaranteeing insureds that poorly-pled claims, that have the potential to result in coverage, remain within the sweep of the duty to defend. That state of equilibrium is fair to both insurers and insureds.

## VI.

Applying those principles, we are satisfied that the trial judge's order requiring GNY to defend plaintiffs' *Portee* complaint

was proper. Here, unlike *SL Industries*, in which the fraud and age discrimination claims literally excluded "bodily injury" coverage, plaintiffs pled a claim for negligent infliction of emotional distress in their *Portee* count. As we said in *Voorhees*, it is well-recognized that "emotional distress can and often does have a direct effect on other bodily functions." *Voorhees, supra,* 128 *N.J.* at 178, 607 *A.*2d 1255 (quoting *NPS Corp., supra,* 213 *N.J.Super.* at 553, 517 *A.*2d 1211) (internal quotation marks omitted). Thus, although that count was silent regarding the existence of physical manifestations, it did not exclude the possibility that such manifestations would be proved during the course of the litigation. Accordingly, it was indefinite whether the claim was within the scope of coverage. In those circumstances, a potential for plaintiffs to prove a covered claim existed and doubts regarding the duty to defend should have been "resolved in favor of the insured." *Id.* at 173, 517 *A.*2d 1211.

To be sure, unlike a garden-variety emotional distress claim, a *Portee* claim does not *require* the physical sequelae which, in *Voorhees*, we declared rendered the term "bodily injury" in the policy ambiguous. *Id.* at 177–78, 607 *A.*2d 1255. Although that distinction might eventually result in the conclusion that an insurance policy limited to coverage for bodily injury would not provide coverage, *see SL Indus., supra,* 128 *N.J.* at 204–05, 607 *A.*2d 1266, it is of no moment in deciding whether the insurer has a duty to defend. In *Voorhees*, the complaint did not allege physical manifestations. *Voorhees, supra,* 128 *N.J.* at 170–71, 607 *A.*2d 1255. Yet, we said it provided the insurer with notice of the possibility of a covered claim, meaning that with proper proofs, coverage would ensue. *Id.* at 174–75, 607 *A.*2d 1255. The same is true here. Plaintiffs' *Portee* complaint alleged emotional distress but was silent regarding physical manifestations, thus providing the potential for a covered claim and triggering the requirement of defense.

Indeed, we presume that the extraordinary level of emotional distress required to support a *Portee* claim—"severe emotional distress," *Portee, supra,* 84 *N.J.* at 101, 417 *A.*2d 521,—will, in

most cases, bear with it a physical component. Thus, a policy providing coverage for claims of "bodily injury" will be understood to require a defense from the filing of a *Portee* complaint unless such defense is specifically excluded by other contract language. That is reasonable from the perspective of the insurer, who is on notice that the plaintiff may, in fact, prove physical sequelae, and from that of the insured, who expects to be defended against potential claims, regardless of the imprecision in the third-party's pleadings.

## VII.

The judgment of the Appellate Division is reversed; the judgment of the trial court is reinstated.

*For reversal and reinstatement*—Chief Justice RABNER, and Justices LONG, LaVECCHIA, ALBIN, RIVERA–SOTO, and HOENS—6.

*Opposed*—None.