**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 11-1995
_____

C.R. BARD, INC.,
Appellant

v.

LIBERTY MUTUAL INSURANCE CO.
(D.N.J. No. 2-07-cv-01895)


_____

No. 11-1996
_____

C.R. BARD, INC.,
Appellant

v.

LEXINGTON INSURANCE CO., AMERICAN INTERNATIONAL SPECIALTY
LINES INSURANCE CO.
(D.N.J. No. 2-07-cv-02547)


_____

On Appeal from the United States District Court
for the District of New Jersey
District Judge: The Honorable Garrett E. Brown, Jr.
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
March 27, 2012

Before: FUENTES, SMITH, and JORDAN, *Circuit Judges*

(Filed: April 2, 2012)

————————————

OPINION

————————————

SMITH, *Circuit Judge.*

Plaintiff C.R. Bard, Inc. ("Bard"), seeking insurance coverage related to two underlying product disparagement suits, brought the instant consolidated actions against defendants Liberty Mutual Insurance Co. ("Liberty"), Lexington Insurance Co. ("Lexington"), and American International Specialty Lines Insurance Co. ("AISLIC") (collectively, Liberty, Lexington, and AISLIC are the "Defendants"). The District Court granted Defendants' motion for summary judgment and Bard appealed. We will affirm.

## I. BACKGROUND

*The Underlying Actions*

Bard is a leading manufacturer of urological medical products, including Foley catheters. Bard generally sells these products directly to either hospitals or group purchasing organizations, which in turn supply multiple health facilities.

In 1998, Rochester Medical Corporation—one of Bard's competitors—introduced a new Foley catheter called the Release-Nitrofurazone Anti-Infection Foley Catheter (the "Rochester Catheter"). According to Rochester, this new catheter releases an anti-microbial agent, nitrofurazone, into the catheter/urethra interface to protect the urethral tract and bladder tissues from infection. Bard's Foley catheter competed directly with the Rochester Catheter.

In 2004, Rochester sued Bard in the United States District Court for the Eastern District of Texas in an action captioned *Rochester Medical Corp. v. C.R. Bard, Inc. et al.*, No. 5:04-cv-00060-DF (the "*Rochester* Action"). This action alleged, *inter alia*, that Bard unlawfully disparaged the Rochester Catheter by intentionally misrepresenting to prospective Rochester Catheter purchasers that nitrofurazone is an "*antibiotic* when it is in fact a *bactericidal*." Rochester Am. Compl. ¶ 28 (emphasis in original).[1] Rochester's complaint further asserted that Bard

> instructed [its] sales personnel to misrepresent to customers that the [Rochester Catheter] could foster the development and spread of antibiotic-resistant pathogens, the so-called "super bugs," that comprise a nationally recognized serious threat for hospital patients, hospitals and the general public and further misrepresented by implication, intentional omissions and direct comparisons with their own product that the silver used in the Bard product was far less likely to cause acquired antibiotic resistance than the nitrofurazone used in the [Rochester Catheter] despite the fact that the antibiotic resistance profiles of both silver and nitrofurazone are identical, each being rated as rare.

*Id.* Rochester's complaint listed specific examples of Bard's unlawful disparaging statements, which included:

> a.    [R]epresenting by letter dated April 16, 2002 from Bard's Medical Division Manager, Rob Hansen, to Fred Gordon at Catholic Health Services that "nitrofurazone . . . is an antibiotic" [; and]
>
> *        *        *
>
> b.    Publishing or causing to be published in August of 1998 an article by Harriet A. Carr in Infection Control Today which refers to the

---

[1] Rochester's complaint further alleged that Bard and others: violated federal and state antitrust laws; and tortiously interfered with Rochester's existing and prospective business relationships and contracts. Bard is not seeking insurance coverage with respect to these claims.

[Rochester Catheter] as "a catheter impregnated with the antibiotic nitrofurazone." The article further states that the Rochester [C]atheter may contribute to the further development of antibiotic resistant neuropathogens. The article further states that "silver (used by Bard) has been used extensively to prevent infections and resistance by microorganisms to silver is rare."

*Id.*

In December 2006, Bard settled the *Rochester* Action for $49 million. Bard asserts that it spent approximately $18 million to defend the *Rochester* Action.

In February 2007, Southeast Missouri Hospital ("Southeast"), a purchaser of urethral catheters, filed a putative class action suit against Bard and others in the United States District Court for the Eastern District of Missouri, captioned *Southeast Missouri Hospital et al. v. C.R. Bard, Inc.*, No. 1:07-cv-00031-TCM (the "*Southeast* Action") (collectively, the *Rochester* and *Southeast* Actions are the "Underlying Actions"). Southeast's complaint alleged that the putative class members paid inflated prices as a result of Bard's anticompetitive conduct. The *Southeast* plaintiffs asserted, *inter alia*, that Bard "engag[ed] in a campaign of disparagement and misinformation" about the Rochester Catheter's likelihood of fostering the development and spread of antibiotic-resistant pathogens. Southeast Second Amended Class Action Complaint ("Southeast complaint") ¶ 45 (taken nearly verbatim from the *Rochester* complaint).[2] The Southeast complaint, like the Rochester complaint, asserted examples of Bard's alleged disparaging conduct, including the aforementioned April 16, 2002 letter by Hansen and the August

---

[2] The *Southeast* Action also asserted claims for violations of the federal and state antitrust laws and for civil conspiracy. Southeast Compl. ¶¶ 85-133. Bard is not seeking insurance coverage with respect to these claims.

1998 article by Carr. *Id.*¶ 46.

On October 6, 2008, the *Southeast* plaintiffs, through their class representative, consented to dismiss their disparagement claim. *Southeast* Action, Dkt. No. 211 ¶ 6. Bard asserts that it spent approximately $17 million defending the *Southeast* Action.

*Bard's Insurance Policies*

Medmarc Casualty Co. ("Medmarc") issued insurance policies to Bard that were effective from January 1, 1997 through April 1, 2003. Bard is not seeking insurance coverage with respect to these policies.

After Medmarc's policies were no longer effective, Bard obtained various policies from Defendants. The following insurance policies are at issue in this appeal: (1) three consecutive policies issued by Liberty to Bard that were in effect from April 1, 2003 through April 1, 2006 (the "Liberty Policies"); (2) the policy issued by AISLIC to Bard that was in effect from April 1, 2003 through April 1, 2004 (the "AISLIC Policy"); and (3) the policy issued by Lexington that was in effect from April 1, 2006 through April 1, 2007 (the "Lexington Policy") (collectively, the Liberty, AISLIC, and Lexington Policies are "Defendants' Policies").

It is undisputed that Defendants' Policies provide Bard coverage for "Advertising Injury," which includes coverage for Bard's alleged disparagement of a competitor's

products.[3]  It is further undisputed that Defendants' Policies include prior publication exception clauses ("PPECs"), which exclude coverage for advertising injuries arising out of oral or written material whose first publication took place before the beginning of the relevant policy period.[4]  The purpose of PPECs is generally to prevent a person who has already caused an injury from purchasing insurance so that he could continue the injurious behavior.

*Procedural Background*

In July 2005, Medmarc commenced an action against Bard in New Jersey state court (the "*Medmarc* Action") seeking a declaration that it was not liable to reimburse or indemnify Bard for the *Rochester* Action (the *Southeast* Action had yet to be filed).  Bard brought a counterclaim against Medmarc, seeking coverage for both of the Underlying

---

[3] The Liberty Policies require Liberty to pay certain sums that Bard becomes "legally obligated to pay as damages because of 'advertising injury.'"  A122 § 1(a).  Advertising injury is defined in the Liberty Policies to include injury arising out of, *inter alia*, "[o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."  *Id.* § 2(a)(1).

The AISLIC and Lexington Policies state that the insurer will pay certain sums that Bard becomes "legally obligated to pay as damages by reason of liability imposed by law because of . . . Advertising Injury to which this insurance applies."  A3479 § I(A); A3512 § I(A).  Advertising injury is defined in the AISLIC and Lexington Policies as an injury arising out of Bard's business from, *inter alia*, an "oral or written publication, in any manner, of material that slanders or libels a person or organization, or disparages a person's or organization's goods, products or services."  A3499 at M(4); A3530 at M(4).

[4] The Liberty PPECs state that the policies do not apply to advertising injuries "arising out of oral or written publication of material whose first publication took place before the beginning of the policy period."  A123 § 4(b).

Similarly, the AISLIC and Lexington PPECs provide that their respective policies exclude coverage for advertising injuries "arising out of oral, written or electronic publication, in any manner, of material whose first publication took place before the beginning of the Policy Period."  A3489 at S(3); A3521 at S(3).

Actions. On March 17, 2008, the trial court granted Bard's motion for summary judgment, and ordered that Medmarc reimburse Bard for "the defense costs incurred that are reasonably associated with the business disparagement claim, and the Lanham Act claim" in the *Rochester* Action. *See* Order of Hon. Marianne Espinosa, J.S.C., dated Mar. 17, 2008, A409. In a response to this order, Bard asserted that "all of the legal expenses incurred by Bard in the defense of the Rochester [Action] are recoverable from Medmarc." A4561 (Ltr. dated Apr. 8, 2008 from Bard's counsel). Bard further stated that Medmarc was responsible for $15,533,302.00 of Bard's total asserted legal costs of $17,159,648.38. A4562.[5]

On March 12, 2007, Bard commenced an action in New Jersey state court against Liberty. Bard sought to recover indemnification and defense costs under the Liberty Policies that it incurred as a result of the Underlying Actions (the "*Liberty* Action"). On April 23, 2007, Bard commenced a separate action in New Jersey state court asserting similar allegations against Lexington under the Lexington Policy (the "*Lexington* Action"). Liberty and Lexington removed their respective actions to the United States District Court for the District of New Jersey, pursuant to, *inter alia*, 28 U.S.C. §§ 1332, 1441, and 1446. On March 24, 2010, Bard filed an amended complaint in the *Lexington* Action joining substantially similar claims against AISLIC. On May 24, 2010, the *Liberty* and *Lexington* Actions were consolidated for discovery purposes.

On December 30, 2010, the District Court denied Bard's cross-motion for

---

[5] The remaining $1,626,346.38, for which Bard agreed Medmarc was not responsible, related to antitrust research issues provided by National Economic Research Associates. A4562 (Ltr. dated Apr. 8, 2008).

summary judgment seeking a declaration that the Lexington Policy provides coverage for Bard's defense costs in the Underlying Actions. On March 11, 2011, the District Court granted Defendants' motions for summary judgment, concluding that the respective PPECs precluded coverage, and denied Bard's motions for partial summary judgment.[6] Bard timely appealed.

## II.   ANALYSIS[7]

Federal courts sitting in diversity must apply state substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). "With respect to an issue of state law in a diversity case, when there is no decision from the state's highest court directly on point, we are charged with predicting how that court would resolve the question at issue." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006) (citing *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 436 (3d Cir. 2006)). When predicting how a state's highest court would resolve the issue, we

---

[6] Bard sought a declaration that: (1) the Lexington and AISLIC PPECs were void under New Jersey law; and (2) AISLIC and Liberty had a duty to reimburse Bard for defense costs in the Underlying Actions.

[7] The District Court had jurisdiction pursuant to 28 U.S.C. § 1332. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

We review the District Court's disposition of a summary judgment motion *de novo,* applying the same standard as the District Court. *Pichler v. UNITE*, 542 F.3d 380, 385 (3d Cir. 2008) (citing *Marten v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007)). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All inferences must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

must consider: "(1) what that court has said in related areas; (2) the decisional law of the state intermediate courts; (3) federal cases interpreting state law; and (4) decisions from other jurisdictions that have discussed the issue." *Id.*

Several principles of New Jersey insurance law are relevant to this diversity action.[8] Courts should interpret insurance policies according to their plain, ordinary meaning. *Nav-Its, Inc. v. Selective Ins. Co. of Am.*, 869 A.2d 929, 933 (N.J. 2005) (quotation marks and citation omitted); *see also Colliers Lanard & Axilbund*, 458 F.3d at 236. "If the policy language is clear, the policy should be interpreted as written, [but] [i]f the policy is ambiguous, the policy will be construed in favor of the insured." *Nav-Its*, 869 A.2d at 933 (citations omitted).

Insurers have the burden of demonstrating the applicability of any exclusion to the policy. *Princeton Ins. Co. v. Chunmuang*, 698 A.2d 9, 17 (N.J. 1997). Although courts should narrowly construe exclusions to an insurance policy, "exclusions are presumptively valid and will be given effect if specific, plain, clear, prominent, and not contrary to public policy." *Id.* (citations and quotation marks omitted).

A. THE PPECs IN DEFENDANTS' POLICIES EXCLUDE
BARD'S CLAIMS FOR INDEMNIFICATION

Defendants do not dispute that the complaints in the Underlying Actions allege advertising injury within the scope of Defendants' Policies. Instead, Defendants argue that the District Court properly concluded that coverage for those claims is excluded under the plain language of the PPECs. We agree.

---

[8] The parties agree that Defendants' Policies are subject to New Jersey law.

Under the PPECs, Defendants' Policies do not cover advertising injury arising from materials that were first published by Bard prior to the relevant policy periods. We conclude that, under these circumstances, the PPECs are unambiguous, written in plain language, and were clearly presented to Bard as an exception to the policies. Defendants' Policies first went into effect on April 1, 2003, and thus, advertising injuries arising out of materials first published before April 1, 2003 are excluded.

Bard argues that the PPECs are inapplicable under the circumstances because the allegedly disparaging statements it made about Rochester's products during the policy periods were not identical to the statements it made prior to April 1, 2003. Defendants counter that, for allegedly disparaging statements made during the policy period to be excluded under the PPEC, those statements need only be substantively similar in content to the prior statements, not identical.

The parties have not cited, nor are we aware of, any decisions by the Supreme Court of New Jersey, New Jersey intermediate courts, or federal appellate courts applying New Jersey law that directly address whether a PPEC applies under the instant circumstances. Thus, we may look to other courts. The Seventh Circuit in *Taco Bell Corp. v. Continental Casualty Co.*, concluded that for a republication of unlawful material during the policy period to fall outside of a PPEC and be covered under the policy, that republication must "contain[] new matter that the plaintiff in the liability suit against the insured alleges as fresh wrongs." 388 F.3d 1069, 1073 (7th Cir. 2004). We have found *Taco Bell*'s reasoning persuasive in other decisions. *See, e.g., Transp. Ins. Co. v. Pa. Mfrs.' Assoc. Ins. Co.*, 346 F. App'x 862, 867 (3d Cir. 2009) (interpreting a

10

PPEC under Pennsylvania law and concluding that "[u]nless later publications contained 'new matter'—i.e., substantively different content—that the [underlying] complaint 'allege[d] [were] fresh wrongs,' the 'prior publication' exclusion applies" (quoting *Taco Bell*, 388 F.3d at 1073)). We predict that the New Jersey Supreme Court would adopt a construction of the PPEC similar to that of *Taco Bell* and *Transportation Insurance.*

Here, the content of Bard's allegedly disparaging statements made during the policy periods were substantively similar to the content of statements made prior to April 1, 2003. *Compare* A4694-95 (an article dated Aug. 1998 by Harriette Carr, a Bard employee, asserting that nitrofurazone is an antibiotic and that the Rochester Catheter may further development of antibiotic-resistant pathogens); A2500, A2502, A2504 (a conversation in late 1998 between Patrick McFadden and Dick Booth, both Bard employees, and representatives of Johns Hopkins Hospital in which McFadden and Booth asserted that a catheter with nitrofurazone may lead to bacterial resistance); A6377, A6383, A6401 (a Bard presentation in Apr. 2001 asserting that the Rochester Catheter was not effective against all bacteria); A6420 (a letter dated Apr. 16, 2002 from Rob Hanson, a Bard employee, to a representative of Catholic Health Services stating that nitrofurazone is an antibiotic); A6432-33 (a Bard presentation dated Feb. 28, 2003, which asserted that nitrofurazone has an embryocidal effect in rabbits and that the Rochester Catheter is not effective against certain gram-negative bacilli or yeasts); *with* A6459-60 (a Bard presentation dated Aug. 4, 2003 containing identical material to the Feb. 28, 2003 presentation discussed *supra*); A6514, A6449 (a presentation by Carr dated Nov. 2003, asserting that there is a concern about resistance related to the "antibiotic coated"

11

Rochester Catheter); A6520-21 (Bard's approved response to Rochester's statement regarding its Catheter, dated Feb. 13-14, 2007, which asserted that Rochester's Catheter is "not effective against yeast and may allow overgrowth of non-susceptible organisms").[9]

Accordingly, the District Court did not err in concluding the PPECs in Defendants' Policies exclude Bard's claims for indemnification.[10]

B.    DEFENDANTS HAVE NO DUTY TO DEFEND OR REIMBURSE BARD FOR

---

[9] Bard argues that four certifications executed by its employees create a genuine dispute of material fact. *See, e.g.*, Pl.'s Br. at 40-43, A5193 ("No two alleged defamation [sic] statements by Bard in its sales and marketing efforts were substantially similar, let alone the same."). Such conclusory statements cannot defeat a motion for summary judgment. *Chambers v. Sch. Dist. of Phila. Bd. of Educ.*, 587 F.3d 176, 197 (3d Cir. 2009). Moreover, Bard has not pointed to sufficient evidence demonstrating how the content of its statements made after April 1, 2003 were both allegedly disparaging and substantively different from its prior statements so as to constitute fresh wrongs as asserted by Rochester and Southeast.

[10] Bard further asserts that the Lexington and AISLIC PPECs violate New Jersey public policy because they are claims-made policies—as opposed to occurrence-based policies—that do not provide reasonable retroactive coverage. Pl.'s Br. at 46-53 (citing *Sparks v. St. Paul Ins. Co.*, 495 A.2d 406 (N.J. 1985) (concluding that claims-made policies providing no retroactive coverage violate public policy)). Courts applying New Jersey law, however, have concluded that exclusions in claims-made policies can be consistent with New Jersey public policy. *See, e.g.*, *Zuckerman v. Nat'l Union Fire Ins. Co.*, 495 A.2d 395, 403-04 (N.J. 1985) (concluding that public policy was not violated by a claims-made policy that generally provided retroactive coverage but excluded coverage of certain claims that the insured knew, or could have reasonably foreseen, might lead to a claim); *see also Colliers Lanard & Axilbund*, 458 F.3d at 239-40 (same).

Here, the Lexington and AISLIC Policies, as opposed to the policy at issue in *Sparks*, provide retroactive coverage for several types of claims, including bodily injury, property damage, false arrest, malicious prosecution, and wrongful eviction. The PPECs only limit personal and advertising injury, and they were intended to prevent a person from purchasing insurance in order to continue his injurious behavior. *See, e.g.*, *Taco Bell*, 388 F.3d at 1072-73. Thus, Lexington and AISLIC's PPECs do not violate New Jersey public policy.

Under New Jersey law, the duty to defend is broader than the duty to indemnify. *S.T. Hudson Eng'rs Inc. v. Pa. Nat'l Mut. Cas. Co.*, 909 A.2d 1156, 1164 (N.J. Super. Ct. App. Div. 2006). "The duty to defend is triggered by the filing of a complaint alleging a covered claim." *Abouzaid v. Mansgard Gardens Assocs.*, 23 A.3d 338, 346 (N.J. 2011). "The complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment, and in reaching a conclusion, doubts should be resolved in favor of the insured." *Id.*

Here, the disparagement claims in the Underlying Actions clearly fall within the PPECs. Rochester's complaint alleged that Bard disparaged the Rochester Catheter by falsely stating it was an antibiotic that could foster the development of antibiotic-resistant pathogens and that Bard's silver Foley catheter did not have the same concerns. Rochester Am. Compl. ¶ 28. Rochester's complaint further listed specific disparaging statements it attributes to Bard employees, several of which occurred prior to April 1, 2003. Southeast's disparagement claim appears to have been taken nearly verbatim from Rochester's claim. Southeast Compl. ¶ 46. There is no indication in either the *Rochester* or *Southeast* complaints that the content of Bard's alleged disparaging statements substantively changed after April 1, 2003. In other words, the complaints contain no allegations of fresh wrongs occurring during the policy periods. Consequently, the PPECs exclude coverage on the face of the complaints and the District Court did not err in concluding that Defendants have no duty to defend or reimburse Bard for defense costs

related to the Underlying Actions.[11]

        Accordingly, we will affirm.

---

[11] Bard also moved to file its unredacted appellate brief and certain documents in the record under seal. Bard asserts that these documents contain highly sensitive proprietary and confidential information and, its appellate brief notwithstanding, were filed under seal with the District Court. Defendants have also moved to file their respective unredacted appellate briefs under seal because they rely on documents subject to Bard's motion to seal. We reviewed the documents at issue and conclude that they contain proprietary and confidential information. Accordingly, we will grant all motions to seal. Because these motions did not specify a desired duration for the sealing order, we will direct the Clerk's Office to seal the materials subject to the aforementioned motions for five years from the conclusion of the case, after which the materials are to be unsealed without notice to the parties. *See* Local App. R. 106.1(c)(2).